**In re Tony Ray HIGGINBOTHAM and Darla Ann Higginbotham, Debtors.**

**Bankruptcy No. 84–01923–W.**

United States Bankruptcy Court,
N.D. Oklahoma.

March 13, 1990.

T.H. Wagenblast, Tulsa, Okl., for debtors.

## ORDER DISMISSING CASE UPON CONDITIONS

MICKEY DAN WILSON, Bankruptcy Judge.

On April 9, 1985, this Court issued its "Order and Notice" to show cause why the above-styled case should not be dismissed pursuant to 11 U.S.C. § 707(b). On the same date the Court deferred entry of debtors' discharge pending resolution of the inquiry under 11 U.S.C. § 707(b). On April 12, 1985, debtors filed their "Objection to Dismissal …;" on April 23, 1985 their "Amended Schedule of Current Income and Anticipated Expenditures;" on April 29, 1985, their "Amended Objection to Dismissal;" and on May 31, 1985, their "Brief in Support …" thereof. Debtors challenged not only the propriety of dismissal but also the constitutionality of 11 U.S.C. § 707(b). The United States of America intervened, and on August 9, 1985, filed its "Brief … in Support of the Constitutionality of 11 U.S.C. § 707(b);" on June 16, 1987, its "Supplemental Brief …;" and on March 23, 1988, its "Notice of Recent Decision" relevant thereto. Upon consideration thereof, and of the record herein, the

Court finds, concludes and orders as follows:

### FINDINGS OF FACT

1. Tony Ray Higginbotham and Darla Ann Higginbotham ("Mr. Higginbotham," "Mrs. Higginbotham," "debtors") filed their voluntary petition for relief under 11 U.S.C. Chapter 7 on December 21, 1984.

2. Pursuant to 11 U.S.C. § 521($l$), Bankruptcy Rule 1007(b) and Official Form No. 7, their "Statement of Financial Affairs for Debtor Engaged in Business," debtors report having engaged in the business of "[p]ainting houses and commercial painting" under the name of "Central Illinois Painting Company" in Robinson, Illinois from January, 1981 to December 1981, Statement of Affairs ¶ 1. Mr. Higginbotham reported being "[c]urrently employed at Byer–Chevy–Buick–Pont. Dealer as Car Salesman," Statement of Affairs ¶ 5. Although required by the official form, no particulars are given as to income received from the car sales business over the preceding two years. Mrs. Higginbotham's occupation is not stated.

3. No lawsuits, executions or attachments were pending, nor had any been pending during the preceding year, Statement of Affairs ¶ 12.

4. Debtors reported owing no taxes or other priority obligations, Official Form No. 6, Schedule A–1.

5. Debtors reported owing $72,219.70 to creditors holding security, as follows: $25,736.70 owing to First National Bank of Oblong, Illinois, secured by fifteen (15) acres of land in Illinois valued at $18,000; $483.00 owed to Avco Financial Services of Oklahoma, Inc., secured by dining room furniture valued at $400.00; and $46,000.00 owed to Home Savings and Loan Association, F.A. of Collinsville, Oklahoma, secured by debtors' homestead valued at $50,000.00, Schedule A–2.

6. Debtors proposed to surrender the acreage in Illinois, leaving a deficiency of approximately $8,000.00; and "[r]etain ... [w]ithout reaffirming the furniture and home in Oklahoma," Statement of Intention.

7. Debtors reported owing $14,363.00 to creditors having unsecured claims without priority, as follows: $12,000.00 owed to First National Bank of Oblong, Illinois for "[d]own payment of fifteen (15) acres in Oblong, Illinois not loan" incurred 1/2/82; $863.00 owed to Home Savings and Loan Association, F.A. of Collinsville, Oklahoma, for "[n]ote loan" incurred 6/12/84; $600.00 owed to Kaw Valley State Bank of Eudora, Kansas for "[n]ote loan" incurred 8/1/79; and $900.00 owed to United States Fidelity & Guaranty Co. for "[e]mployees insurance for job coverage" incurred in "1981," Schedule A–3. (The cryptic notation "not loan" presumably should read "note loan".)

8. Debtors' reported assets include the fifteen (15) acres in Illinois; the homestead in Oklahoma, including equity of about $4,000.00; three (3) guns worth $500.00; three (3) trucks valued at $2,550.00; a calf valued at $250.00; household goods valued at $1,200.00 and moneys of $375.00 in cash or on deposit, Schedule B–1, B–2, B–3, B–4.

9. Debtors report possession but not ownership of "demo car from employer," Statement of Affairs ¶ 8.

10. The Trustee has filed no reports in this case.

11. Debtors' initial "Schedule of Current Income and Anticipated Expenditures" filed with their petition reported Mr. Higginbotham's "net monthly income" as $1,400.00 and Ms. Higginbotham's "net monthly income" as $638.00 for a total "net" income of $2,038.00 per month; and expenses of $1,511.00 per month; for a net excess of income over expenses of $527.00 per month.

12. The schedule referenced immediately above reports expenses of only $300.00 per month for food for two adults and at least one child; only $70.00 per month for "[t]ransportation (including auto payments);" no tax payments; "Avco Furniture $80.00 monthly & $400.00 total;" "Home Savings unsecured $60.00 monthly $800.00 total" and "Calf feed $40.00."

13. After receiving the Court's "Order and Notice to Show Cause," debtors filed their "Amended Schedule of Current Income and Anticipated Expenditures," reporting total expenses of $2,373.00 per month for a net deficit of income under expenses of $335.00 per month.

14. The increased total of expenses was due in part to a reported increase in almost every living expense item on debtors' list.

15. The balance of the total increase was due to an additional $512.00 per month in new expenses, as follows: "Two visits per year to Illinois" at "$200.00 per visit;" $1,500.00 for "root canal work" which has not previously been done "because we can't afford it;" "school lunches" and Mr. Higginbotham's lunch "which total [$]70.00" (in addition to a general increase in expenses for food of $100.00 per month); "$200.00 monthly for purchase of auto" to "replace our truck with a good car since all of our current vehicles have over 100,000 miles on them;" "repair transmission in 1976 pickup will cost $400.00;" and "maint[en]ance on our house which would average [$]50.00 per month," Amended Schedule of Current Income and Expenditures, Exhibit "A".

16. Addressing their attorney, debtors state that "We also didn't realize you wanted anticipated expenses," Amended Schedule of Current Income, Exhibit "A".

17. Any recitations elsewhere in this opinion which should be included among "Findings of Fact" are incorporated herein by reference.

## CONCLUSIONS OF LAW

■ Debtors argue that the facts in this case do not show a substantial abuse under 11 U.S.C. § 707(b), and further that 11 U.S.C. § 707(b) is itself unconstitutional for various reasons. The constitutionality of statutes should not be ruled on except when absolutely necessary, 16 AM.JUR.2d (2nd ed. 1979) §§ 160, 172. Therefore, the Court will first consider whether the facts herein show a substantial abuse under 11 U.S.C. § 707(b), and only if so will the Court proceed to consider whether the stat-

ute which thus obstructs debtors is constitutional.

■ 11 U.S.C. § 707(b) by its terms applies to debtors "whose debts are primarily consumer debts." The Court observes that debtors' debts were incurred for the purchase of fifteen (15) acres of land in Illinois whose use is unknown (but may have been rural homestead in Illinois,) for purchase of dining room furniture, and for purchase of debtors' present home in Oklahoma, for "note loans" whose precise purpose is unspecified, and for "[e]mployees' insurance for job coverage." A home mortgage debt is a consumer debt for 11 U.S.C. § 707(b) purposes whether or not for other bankruptcy purposes; cases to the contrary such as *In re Kelly*, 70 B.R. 109, 15 B.C.D. 572, BLD ¶ 71633 (9th Circ.BAP, 1986) not only disregard the plain meaning of 11 U.S.C. § 101(7) and its official legislative history, but also perversely credit Congress in 1984 with enacting § 707(b) with the specific design that it apply to almost no one; and such cases are not followed by this Court. The debt for dining room furniture is clearly a consumer debt; the nature of the debts for the Illinois land and "note loans" is unclear. Debtors chose to file a "Statement of Financial Affairs for Debtor Engaged in Business," but the reason for their choice is unclear, since only a single debt, for "[e]mployees' insurance for job coverage," is clearly business-related. Although 11 U.S.C. § 707(b) establishes "a presumption in favor of granting the relief requested by the debtor," this goes to the merits of the propriety of relief under Chapter 7 and not to the applicability of 11 U.S.C. § 707(b) itself; nor does it relieve debtors of their obligation to file complete and informative schedules. It appears probable that the debts herein are "primarily consumer debts" in terms of both amount of debt and number of creditors. Debtors do not challenge the applicability (though they do challenge the constitutionality) of 11 U.S.C. § 707(b), and so apparently concede that theirs are "primarily consumer debts."

Given that 11 U.S.C. § 707(b) applies, the question is whether debtors' invocation of

Chapter 7 under the circumstances was a "substantial abuse of the provisions of this chapter."

"Substantial abuse" is not defined by any part of the Bankruptcy Code. Formal legislative history of 11 U.S.C. § 707(b) is lacking; but floor statements indicate that the provision was intended to encourage resort to Chapter 13, see 4 *Collier on Bankruptcy* (15th ed. 1989) ¶ 707.05 p. 707–13 n. 4 (citing Congressional Record), wherein disposable income as defined in 11 U.S.C. § 1325(b)(1)(B), (b)(2)(A) is applied to partial or total repayment of debts over a period of about three years and not more than five years, 11 U.S.C. §§ 1306, 1322, 1325.

■■■ Under the former Bankruptcy Act, it was well established that, with or without specific statutory authorization, bankruptcy courts could dismiss or convert cases filed under inappropriate chapters, i.e., where relief under the chapter chosen by the debtor would be unnecessarily prejudicial to the rights and interest of creditors, Act §§ 114–174; *Collier on Bankruptcy* (14th ed. 1976) Vol. 6 (Part 2) ¶ 6.02[1], Vol. 8 ¶ 4.12, Vol. 9 ¶ 4.12, Vol. 10 ¶ 24.12; *Securities & Exchange Comm. v. United States Realty & Improvement Co.*, 310 U.S. 434, 455–459, 60 S.Ct. 1044, 1053–1054, 84 L.Ed. 1293 (1940). All courts have inherent power to protect their jurisdiction from abuse, *id.;* 1 *Moore's Federal Practice* (2nd ed. 1989) ¶ 0.6–[6]; 20 AM.JUR.2D "Courts" §§ 78–79. Equity courts in particular are guided in their exercise of jurisdiction by maxims such as *Equity Aids the Diligent* ("Where the result complained of is induced by the plaintiff's own conduct, equity will generally refuse relief. Equity insists upon the conscientious obligations of suitors ... the maxim has been employed broadly to deny relief to those who neglect to take care of themselves, and who thereby suffer loses which ordinary care would have prevented ... relief will be denied to one whose prejudicial situation is attributable to his own 'negligence,' 'carelessness,' 'want of diligence,' 'folly,' or 'inattention,'" 27 AM.JUR.2d "Equity" §§ 129, 130) and *He Who Seeks Equity Must Do Equity* ("Courts of equity have for a long time granted relief upon such conditions as are just and proper and demanded by the exigencies of the circumstances ... undoubtedly, a court of equity has power to make its granting of relief dependent upon the performance of conditions by a party litigant, if the conditions are such as are imposed in the exercise of a sound discretion and of a character calculated to satisfy the dictates of conscience. The Court may thus protect and give effect to the rights of one party while awarding relief to the other, and in doing so, the court is not restrained by strict legal rights ... In some situations, however, the court's power in this respect should be exercised with caution," *Id.* § 134). These maxims are, or should be, operative in bankruptcy, since "[a] bankruptcy court is a court of equity ... and is guided by equitable doctrines and principles except insofar as they are inconsistent with the [B]ankrupty Act ... Good sense and legal tradition alike enjoin that an enactment of Congress dealing with bankruptcy should be read in harmony with the existing system of equity jurisprudence of which it is a part," *Securities & Exchange Comm. v. United States Realty & Improvement Co.*, supra, 310 U.S. at 455, 457, 60 S.Ct. at 1053, 1054.

Legislative history of the original 1978 Bankruptcy Code indicates that Chapter 7 was supposed to be a "last resort," H.Rep. No. 95–595, 95th Cong., 1st Sess., Pgs. 118, 125, U.S.Code Cong. & Admin.News 1978, p. 5787. Yet Congress refused to specify by statute that Chapter 7 cases might be dismissed when filed by debtors who could afford to repay their debts, explaining itself in legislative history to 11 U.S.C. § 707 [now § 707(a) ] as follows:

> The section does not contemplate, however, that the ability of the debtor to repay his debts in whole or in part constitutes adequate cause for dismissal. To permit dismissal on that ground would be to enact a non-uniform mandatory chapter 13, in lieu of the remedy of bankruptcy. The Committee has rejected that alternative in the past, and there has not

been presented any convincing reason for its enactment in this bill,

H.Rep. No. 95–595, p. 380; and see S.Rep. No. 95–989, p. 94, U.S.Code Cong. & Admin.News 1978, pp. 5880, 6336. The cryptic final sentence is explicated elsewhere as follows:

> As under current law, chapter 13 is completely voluntary. This Committee firmly rejected the idea of mandatory or involuntary chapter XIII in the 90th Congress. The thirteenth amendment prohibits involuntary servitude. Though it has never been tested in the wage earner plan context, it has been suggested that a mandatory chapter 13, by forcing an individual to work for creditors, would violate this prohibition. On policy grounds, it would be unwise to allow creditors to force a debtor into a repayment plan. An unwilling debtor is less likely to retain his job or to cooperate in the repayment plan, and more often than not, the plan would be preordained to fail. Therefore, the bill prohibits involuntary cases under chapter 13, and forbids the conversion of a case from chapter 7, liquidation, to chapter 13, unless the debtor requests.

The Bankruptcy Commission also considered proposals that would permit an individual to file straight bankruptcy only if he were unable to obtain adequate relief under chapter XIII. The commission rejected the proposal, and stated their reasons as follows:

> The arguments against the proposal included objections made to the difficulties of achieving any nationally uniform standard of application by referees throughout the country, as evidenced by the divergence of their viewpoints regarding the virtues of Chapter XIII. Another view expressed by opponents was that fulfillment of a debtor's commitment made pursuant to a Chapter XIII plan requires not merely a debtor's consent but a positive determination by him and his family to live within the constraints ·imposed by the plan during its entire term and a will to persevere with the plan to the end. Imposition of a Chapter XIII plan on an unwilling debtor, it was said, would be almost bound to encourage the debtor to change employment and, if necessary, to move to another area to escape the importuning calls and correspondence of his creditors. Likewise, those petitioning debtors turned away by the court on the ground that they failed to show that relief would not be obtainable under Chapter XIII would be motivated to change jobs and locations to get away from creditors who would threaten garnishment and other means of collecting debts. In states where wage garnishment is an unavailable remedy of creditors, the impact of the proposed legislation would have been minimal. A final argument made in opposition to the proposed legislation was that business debtors are not subject to any limitation on the availability of straight bankruptcy relief, including discharge from debts, and it was pointed out that, quite apart from bankruptcy, business debtors are able to incorporate and to limit their liability to their investments in corporate assets. To force unwilling wage earners to devote their future earnings to payment of past debts smacked to some of debt peonage, particularly when business debtors could not be subjected to the same kind of regimen under the Bankruptcy Act.

> The Commission has considered the arguments made for conditioning the availability of bankruptcy relief, including discharge, on a showing by the debtor that he cannot obtain adequate relief from his condition of financial distress by proposing a plan for payment of his debts out of his future earnings. The Commission has concluded that forced participation by a debtor in a plan requiring contributions out of future income has so little prospect for success that it should not be adopted as a feature of the bankruptcy system.

H.Rep. No. 95–595, pp. 120–121, U.S.Code Cong. & Admin.News 1978, pp. 6080–6082.

In 1984, Congress reiterated its position by enacting 11 U.S.C. § 707(b)'s "presumption in favor of" Chapter 7 relief.

■ Thus, the Bankruptcy Code appears schizophrenic, meaning Chapter 7 to be reserved for use as a desperation measure yet treating it as the standard form of bankruptcy relief even under circumstances not at all desperate. This legislative schizophrenia seems based on apprehensions of involuntary servitude in violation of the 13th Amendment, and supposed practical difficulties in "forcing" debtors to go through Chapter 13 unwillingly. With all due respect for Congressional Committees and the Bankruptcy Commission, their apprehensions are difficult to fathom or to credit. As discussed below in this opinion (see p. 967 infra), fears of involuntary servitude are absolutely unfounded so long as the bankruptcy petition itself, under whatever chapter, is filed by debtor and not by his creditors. The Committee appears to confuse *involuntary* Chapter 13 (in which creditors could force debtors into Chapter 13 by filing an involuntary petition, thereby seizing debtors' income) with exclusive but *voluntary* Chapter 13 (in which debtor will get no discharge without a plan, yet debtor can choose whether or not to enter bankruptcy at all), and rejects both as violative of the Constitution. Yet only the former could possibly be called an involuntary servitude; the latter involves only "the price of discharge" in voluntary bankruptcies, a matter well within the discretion of Congress and the Courts. If judges are to do nothing unless they will all do it in a perfectly uniform manner, then judges must do nothing, everywhere and always. The fear that an unwilling Chapter 13 debtor would quit his job and leave the State "to escape the importuning calls and correspondence of his creditors" is unfounded, for if debtor is in Chapter 13, creditor harassment will be stayed by 11 U.S.C. § 362(a). It is true that debts will not be repaid if debtor absconds; but debts will also not be repaid if they are discharged in Chapter 7, and at least in the former case the injury to creditors is not tainted with legality (or, worse, with so-called "equity"). An "unwilling" Chapter

13 debtor's plan may not succeed; but why should discharges under Chapter 13, or any other Chapter, be granted to debtors who are able but "unwilling" to pay their just debts? The statement that "business debtors are not subject to any limitations on the availability of [Chapter 7] relief, including discharge," is inexplicable. Chapter 7 discharge is not available to corporations, 11 U.S.C. § 727(a)(1); and individuals owing business debts and able to repay them might be subject to the same policing measures as consumer debtors—if Chapter 13 is not available to some business debtors, Chapter 11 is. Peonage means forcing a debtor to work for his creditor on pain of imprisonment, 45 AM.JR.2D (1969) "Involuntary Servitude" § 10, and is a Federal crime, 42 U.S.C. § 1994, 18 U.S.C. § 1581. But withholding a Chapter 7 discharge does not force a debtor to work; and can anyone seriously suggest that refusal to abet a deadbeat (by refusing to grant an undeserved discharge) would be a Federal crime? Moreover, for all these grave reservations about dismissing Chapter 7s on the basis of ability to pay debts, Congress in enacting the Bankruptcy Code in 1978 never did affirmatively *forbid* the policing of Chapter 7 in such manner—Congress merely refrained from *requiring* it.

■ In short, are all considerations of equity and judicial power and responsibility to be overturned by an ill-considered Committee report? The answer must surely be, "No." No portion of the Bankruptcy Code, nor even its legislative history, purports to abolish equity, or strip it from bankruptcy operations. With due regard for Congressional concerns expressed by refusal to enact statutes and in Committee reports, the Courts nevertheless retain both power and duty to see that bankruptcy, so long as it remains an equitable remedy, meets minimal equitable standards. Congress wants the propriety of relief under Chapter 7 "presumed;" so be it. But where the presumption's own underpinnings collapse—where there is a clear abuse of Congress' own intentions as to the use of Chapter 7, and a clear violation of those fundamental equities on which any

**964**

discharge-injunction must be founded—then the courts may still act to prevent the perversion of Congressional policy and gross imposition on the courts themselves. Debtors' ability to repay some part of their debts does not, per se, bar them from Chapter 7. But it may be one factor, and an important factor, in determining whether the provisions of Chapter 7 are being abused, and whether dismissal of the Chapter 7 (in hopes that debtors will resort to another Chapter, e.g. Chapter 13) is in order.

■ These things considered, a "substantial abuse" would seem to include that situation wherein relief under Chapter 7 is unnecessarily prejudicial to creditors, in that there is no apparent emergency, disaster or untenable situation to be remedied—relief under Chapter 13 is available, is not unduly burdensome to debtors, and would result in repayment of all or most of debtors' outstanding debt within the term of a Chapter 13 plan—while Chapter 7 relief would result in little or no dividend to creditors and would amount to a reward for debtors' own lack of diligence or judicial blessing of an unconscionably one-sided, opportunistic adjustment of the debtor-creditor relationship.

Debtors propose to retain certain property subject to security interests without reaffirming the secured debt. This implies that debtors will continue making payments even without formal reaffirmation, else the secured creditors would be provoked to repossess or foreclose on their collateral. Payments to Avco Financial and to debtors' home mortgagee are listed on debtors' "Schedule of Current Income and Anticipated Expenditures." Excluding these debts, the debts to be effectively discharged total approximately $23,000, almost all of it owing to Oblong Bank of Illinois on the Illinois realty.

■ Debtors' initial "Schedule of Current Income and Anticipated Expenditures" reported disposable income of at least $527.00 per month. After being threatened with dismissal under § 707(b), debtors amended said schedule to show a deficit of—$335.00 per month. Why would debtors actually "in the red" by over $300.00 per month sign without cavil a schedule showing them "in the black" by over $500.00 per month? Debtors told their attorney that "[w]e ... didn't realize you wanted anticipated expenses," but the title of their attorney's form includes the words "Anticipated Expenditures" conspicuously displayed. Even if some future expenses were omitted, some listed expenses seem likely of short duration or doubtful necessity. Granted that debtors' initial list of expenses seems unrealistically low, the Court nevertheless believes it is nearer the truth than debtors' later, self-serving amended list. The Court determines that debtors possess an actual excess of income over expenses of approximately $400.00 per month.

■ The Trustee has apparently taken no action in this case, probably because of the pendency of this inquiry under 11 U.S.C. § 707(b). Debtors' assets appear either exempt or encumbered and unavailable for liquidation by the Trustee; the non-exempt gun valued at $100.00 and the non-exempt pickup valued at $50.00 would likely be abandoned by the Trustee as not valuable enough to warrant the cost of liquidation and distribution. Yet debtors' three guns and calf, even if exempt, are not in the least essential to debtors' welfare; they are merely expensive toys. The Court may not deny exemptions prescribed by the Legislature, 11 U.S.C. § 522(b), 31 O.S.A. § 1(B), merely because the Court considers them to be unnecessary; but the Court *may* consider debtors' disposition of any and all of their property, exempt or otherwise, as part of the pattern of legal and economic behavior that goes to make a substantial abuse of the provisions of 11 U.S.C. Chapter 7. Debtors' three vehicles are likewise to be retained and at least partially repaired, and debtors propose to buy another new one, though Mr. Higginbotham already seems to have a car on loan from his present employer. Thus debtors want one calf, three guns and five cars and trucks, along with the Chapter 7 discharge.

Assuming disposable income of $400.00 per month, debtors could repay their entire dischargeable debt in fifty-eight months or just under five years.

There is no emergency or disaster—the debts to be discharged are mostly several years old; debtors are not being sued or threatened with execution, attachment or garnishment. Debtors are not in an untenable situation—they have jobs, substantial excess income and significant liquid value tied up in superfluous vehicles and expensive toys. The main effect and presumable object of this bankruptcy is the discharge of debt owing to a single creditor, Oblong Bank of Illinois, which debtors seemingly find inconvenient to pay now that they no longer have any use for the land in Illinois that Oblong Bank helped them buy. Chapter 7 would result in little or no distribution to creditors; Chapter 13 would enable debtors to repay more than half their debts in three years or their entire debt in just under five years. Debtors do have a relatively low income and significant debts; they may well be entitled to some sort of bankruptcy relief—but the question is whether Chapter 7 is the right sort. The Court concludes that the granting of relief in Chapter 7 under the circumstances would indeed be a substantial abuse of the provisions of 11 U.S.C. Chapter 7, and that, therefore, pursuant to 11 U.S.C. § 707(b), the case should be dismissed—apart from Constitutional difficulties, which will now be discussed.

Debtors argue that § 707(b) is unconstitutional, either for vagueness in violation of due process under the 5th Amendment, or as arbitrary and capricious in violation of the equal protection component of due process under the 5th Amendment, because § 707(b) does not define the term "substantial abuse."

Debtors assert that the lack of definition of the term "substantial abuse" subjects them to arbitrary, capricious deprivation of right or liability to penalty, and cite *Connally v. General Construction Co.,* 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *Winters v. New York,* 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948); *Giaccio v.*

*Pennsylvania,* 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); and *Garner v. White,* 726 F.2d 1274 (8th Circ.1984). These cases deal with statutes creating criminal or quasi-criminal penalties and/or with threatened infringement of 1st Amendment rights. Where 1st Amendment freedoms are not concerned, the rule is that a statute is unconstitutionally vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all," *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971); and see *Village of Hoffmann Estates v. The Flipside, Hoffmann Estates, Inc.,* 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). Debtors also cite *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), which appears to declare a similar rule; that case proscribes criminal statutes which are "intended to confer, and actually do confer, not a discretion to be exercised upon a consideration of the circumstances of each case, but a naked and arbitrary power to give or withhold consent" and which are "purely arbitrary, and acknowledge ... neither guidance nor constraint," *id.* 118 U.S. at 366, 367, 6 S.Ct. at 1068, 1069. Civil statutes are subject to less rigorous review than criminal statutes, *Village of Hoffmann Estates v. The Flipside, Hoffmann Estates, Inc.,* supra, 455 U.S. at 499, 102 S.Ct. at 1193.

11 U.S.C. § 707(b) is not criminal or quasi-criminal. It does not infringe on any Constitutional right, and indeed does not deprive debtors of any "right" and is not a "penalty" at all. A discharge in bankruptcy, and especially in Chapter 7, is an injunction, 11 U.S.C. § 524(a), which represents an extraordinary intervention of equity in debtors' normal legal and financial affairs. As such, it is a privilege, not a "right" in the sense of something to be demanded at any time by all and sundry. 11 U.S.C. § 707(b) calls for withholding of this extraordinary relief where such relief is unnecessary and inappropriate—for withhold-

ing of this extraordinary privilege where debtors do not deserve the privilege. Equity's refusal to intervene where intervention would be improper takes nothing away from debtors, but merely restores or leaves unaffected debtors' own normal arrangement of rights and liabilities under State and other non-bankruptcy law. Debtors might as well argue that an equity court's refusal to grant an injunction where sufficient cause was not shown, violates debtors' "rights" and inflicts a "penalty." Of course, even a privilege should be granted or withheld according to some standard. Section 707(b) does provide a standard, even though the details must be worked out by judicial decisions. This is not uncommon—"fraud" and "good faith" are such terms; so is "due process" itself. Debtors protest that judges will define and apply the substantial-abuse standard "in an arbitrary and unequal fashion," debtors' brief p. 7. No doubt judges will apply it unequally, so long as judges remain human—this cannot be helped and is a problem not confined to § 707(b). But "unequal" is not necessarily "arbitrary or capricious." If the possibility of judicial difference of opinion violates equal protection, then pretty much all of our law, statutory or otherwise, is unconstitutional. We strive toward a government of laws, not men; but we cannot have a government of robots. Although § 707(b) unavoidably subjects debtors to judicial difference of opinion, it does not subject them to judicial whim without "guidance or constraint," *Yick Wo v. Hopkins*, supra, 118 U.S. at 367, 6 S.Ct. at 1069. While the statute might have been more specific, it is definite enough to pass Constitutional muster in this regard.

Debtors further argue that § 707(b) is unconstitutional in violation of the equal protection component of due process under the 5th Amendment because the statute by its terms applies to debtors "whose debts are primarily consumer debts ..." which "... singles out the investor/businessman for preferential treatment," debtors' brief p. 8.

Section 707(b) has sometimes been read and applied as if it forbade judicial review of abuses which do not involve "primarily consumer debts," and thus restricted the courts' otherwise inherent power and duty to police *all* cases for abuse, *In re Booth*, 858 F.2d 1051 (5th Circ., 1988); *In re Bell*, 65 B.R. 575 (E.D.Mich., 1986). But if this makes § 707(b) unconstitutional, what is unconstitutional is not the provision for judicial review, but only the limitation on judicial review; so the remedy would seem to be to sever that part of § 707(b) which purports to limit review to cases involving "primarily consumer debts," leaving the rest of the statute undisturbed and thereby extending the reach of the statute to all cases, 16 AM.JUR.2D "Constitutional Law" §§ 260 et seq. This Court has not in the past limited, and will not in the future limit, its power and duty to prevent abuse of the bankruptcy process to any particular class of cases, debts, debtors or creditors, notwithstanding anything in § 707(b) to the contrary. Therefore, any violation of equal protection in § 707(b) in this regard will not save these debtors from review and dismissal for abuse of Chapter 7.

Debtors further argue that § 707(b) is unconstitutional as a violation of the 13th Amendment in that the statute "could force persons into a state of involuntary servitude," debtors' brief p. 9.

The 13th Amendment proscribes slavery or its functional equivalents, e.g. peonage, *U.S. v. Kozminski*, 487 U.S. 931, 941–42, 108 S.Ct. 2751, 2759, 101 L.Ed.2d 788, 804ff. (1988). As noted above, § 707(b) is intended to prevent debtors who are capable of paying their just debts from discharging them by misuse of an extraordinary privilege to which they are not properly entitled. If this violates the 13th Amendment, then it would seem that having to pay one's just debts is "slavery" or "peonage"—put another way, debtors would read the 13th Amendment as if it provided a *Constitutional right* to a Chapter 7 discharge! The great majority of Americans who work hard to pay off their voluntarily-incurred debts might be a bit surprised to hear the Protestant Ethic described as "slavery."

Judicial review of voluntarily-filed Chapter 7 cases for abuse does not force anyone to work and does not force debtors to divert any part of their income to payment of debts. Such judicial review merely requires debtors who already work and have enough income to pay their debts to "take their chances" under State law if they refuse to meet their obligations, by refusing in turn to grant equitable intervention to protect such debtors from State debt-collection mechanisms where insufficient cause for such intervention has been shown. Notwithstanding certain fears expressed in legislative history, H.Rep. No. 95–595, 95th Cong., 1st Sess., pp. 120–121, there is little chance of a 13th Amendment violation in such a situation. Whether an order of conversion from Chapter 7 to some other chapter, or involuntary filing of a case under Chapter 11 by creditors against a debtor, might approach an unconstitutional "involuntary servitude" is a question not before the Court here. Debtors apparently propose that some set of circumstances may some day arise which might amount to "involuntary servitude" maintained with the help of § 707(b). The courts may deal with such situations as they may arise; a statute is not to be declared unconstitutional for all purposes just because someday, somehow, it might be unconstitutional "as applied" in a particular case. This Court does not understand debtors to say that theirs is such a case; nor does this Court perceive a trace of "slavery" or "peonage" in the facts of this case.

■■■■ Debtors further argue that § 707(b) is unconstitutional in violation of due process because of its requirement of *sua sponte* action by the Court.

Debtors cite no authority for the proposition that the adversary system is a Constitutional *sine qua non*. If such authority existed, it would implicate *sua sponte* action by all courts everywhere, not just by Bankruptcy Courts under 11 U.S.C. § 707(b). The statute's apparent prohibition of action by parties-in-interest does, at first blush, appear to restrict creditors' access to court; but debtors lack standing to argue this point, and its resolution would not diminish this Court's *sua sponte* powers in any event. This Court is well aware of the difficulties of *sua sponte* proceedings; yet they are, in some degree, a necessary evil, to be limited as much as practicable as a matter of degree. But as long as this Court issues discharges, this Court retains and will exercise some degree of independence in determining whether discharge is proper. This Court knows of no Constitutional mandate to hamstring itself.

Debtors have not shown that the United States Constitution prevents operation of 11 U.S.C. § 707(b) in any manner or to any extent that would insulate debtors from judicial review for substantial abuse of 11 U.S.C. Chapter 7.

■■■■ The effect of the rulings above is to determine that debtors' objection to the Court's original "Order and Notice" to show cause dated April 9, 1985, is legally insufficient to show that there is no substantial abuse in this case or to show any Constitutional impediment to dismissal as a consequence of the appearance of substantial abuse. Nevertheless, the Court recognizes that the present Order, and not the original "Order and Notice" to show cause, is the first detailed statement in the record of the Court's own reasons for concluding that this case presents a substantial abuse of the provisions of 11 U.S.C. Chapter 7. Moreover, debtors in their objection dated April 12, 1985, requested a hearing. The submission of detailed briefs by debtors and by the intervenor U.S.A., and their consideration by the Court, may suffice as the requested "hearing." But the Court prefers to give debtors the benefit of any doubt in this regard. The present Order establishes at least a *prima facie* determination of substantial abuse, sufficient to provide a basis for determination of the Constitutional issues raised. But the Court will provide debtors one further opportunity to rebut the *prima facie* determination that this case is a substantial abuse of the provisions of Chapter 7.[1]

---

1. This Court has since developed a procedure whereby a detailed statement of facts appearing and inferences arising from the record is made in the Court's initial order to show cause; debt-

968

IT IS THEREFORE ORDERED that this case under 11 U.S.C. Chapter 7 be dismissed upon the expiration of twenty (20) days after the date of entry of this Order; provided, however, that if debtors file a "Request For Further Hearing" within such time, requesting further hearing on the sole issue of whether the facts of this case did constitute or do now constitute a substantial abuse of the provisions of 11 U.S.C. Chapter 7, then this case shall not then be dismissed, but the matter shall be set for further hearing and the case dismissed only if appropriate after said hearing.

ors are directed to respond in writing by a date certain or be dismissed; any response by debtors which satisfies the Court that Chapter 7 relief is proper results in withdrawal of the order to show cause without formal hearing; any response by debtors which does not satisfy

the Court that Chapter 7 relief is proper is set for hearing, and only thereafter may dismissal ensue. The Court hopes that motions by the Assistant United States Trustee will largely replace the Court's own orders to show cause.