In re Richard W. GOODSON, EI/SS# 448–40–9395, Debtor.

Bankruptcy No. 88–03318–W.

United States Bankruptcy Court, N.D. Oklahoma.

Aug. 16, 1991.

Jonathan Alden, Tulsa, Okl., for debtor.

Katherine Vance, Tulsa, Okl., Asst. U.S. Trustee.

ORDER GRANTING U.S. TRUSTEE'S MOTION TO DISMISS UNDER 11 U.S.C. § 707(b)

MICKEY DAN WILSON, Chief Judge.

On January 31, 1989, U.S. Trustee filed her "Motion to Dismiss . . ." pursuant to 11 U.S.C. § 707(b) of Debtor's voluntary Chapter 7 case. Debtor filed his "Response" on February 14, 1989, and supplemented the same with a "Trial Brief" on March 6, 1989. Hearing on this matter was held on March 9, 1989. Upon consideration thereof, and of the record herein, the Court finds, concludes and orders as follows:

## FINDINGS OF FACT

1. Richard William Goodson ("Mr. Goodson," "Debtor") filed his voluntary petition for relief under 11 U.S.C. Chapter 7 on October 28, 1988.

2. Debtor is married to Sandra G. Goodson ("Mrs. Goodson") and has two children aged 18 and 21 at the time of the filing of the petition. Mrs. Goodson did not join Debtor in filing this bankruptcy case.

3. Debtor's "Statement of Financial Affairs for Debtor not Engaged in Business" reports that Debtor's occupation for the past twenty years has been that of Manager of Dispatching at Williams Pipe Line Co., in Tulsa, Oklahoma, Statement of Affairs # 2a, b. Debtor reports his income for 1986 as $64,758.00 and for 1987 as $66,428.00, Statement of Affairs # 2d. Debtor reports his income for 1988 as $74,000.00 and the same $74,000.00 as his expected 1989 income, Debtor's testimony at hearing held on March 9, 1989. Debtor also has a 35% ownership interest in Bon Voyage Travel, Inc., an Oklahoma corporation. Mrs. Goodson owns the remaining 65% of that corporation, Statement of Affairs # 2c. Debtor reports interest income in 1986 as $109.00 and in 1987 as $107.00, Statement of Affairs # 2e. Debtor also reports dividend income in 1986 of $283.00 and in 1987 of $353.00, Statement of Affairs # 2e. A rental house sale in 1986 contributed $5,305.00 to Debtor's income.

4. Debtor reported no previous bankruptcy filings, Statement of Affairs # 8.

5. No lawsuits, executions or attachments were pending, nor had any been pending during the preceding year, Statement of Affairs # 10.

6. Debtor reported owing no taxes or other priority obligations, Official Form No. 6, Schedule A–1.

7. Debtor reported owing $98,791.00 to creditors holding security, as follows: $92,000.00 owing to Troy & Nichols of Monroe, Louisiana, secured by Debtor's homestead valued at $130,000.00; $4,900.00 owing to First National Bank of Jenks, Oklahoma, secured by a 1983 Buick Riviera valued at

$5,500.00; and $1,891.00 owing to Williams Employees Credit Union of Tulsa, Oklahoma, secured by a 1981 VD Jetta valued at $1,700.00, Schedule A–2.

8. Debtor reported owing $49,426.91 to creditors having unsecured claims without priority, as follows: $6,744.31 owing to Maryland Bank NA of Wilmington, Delaware for a Mastercard credit account used to purchase consumer goods on various dates; $5,150.67 owing to Lomas Bank, U.S.A. Credit Card of Wilmington, Delaware for a Mastercard credit account used to purchase consumer goods on various dates; $4,412.90 owing to Citibank of Sioux Falls, South Dakota for a Visa credit account used to purchase consumer goods on various dates; $4,940.80 owing to NCNB South Carolina of Greensboro, North Carolina for a Visa credit account used to purchase consumer goods on various dates; $1,913.70 owing to American Express Centurion Bank of Wilmington, Delaware for an Amex credit account used to purchase consumer goods on various dates; $4,877.55 owing to American Express Centurion Bank of Dallas, Texas for an Optima credit account used to purchase consumer goods on various dates; $1,199.62 owing to Utica Bank of Tulsa, Oklahoma for an American Express credit account used to purchase consumer goods on various dates; $470.06 owing to Dillard's of Little Rock, Arkansas for a Dillard's credit account used to purchase consumer goods on various dates; $117.30 owing to Renberg's of Tulsa, Oklahoma for a Renberg's credit account used to purchase consumer goods on various dates; $9,600.00 owing to Williams Employee Credit Union of Tulsa, Oklahoma for a signature line of credit account used on various dates; $6,000.00 owing to Oklahoma Student Loan Authority of Oklahoma City, Oklahoma for an education loan incurred in April and August, 1988; and $4,000.00 owing to Community Federal of St. Louis, Missouri for an education loan incurred in August, 1988.

9. Debtor's reported assets include one-half interest in the homestead in Oklahoma, with equity of about $38,000.00; household goods valued at $5,150.00; books, pictures, art and/or collections valued at $800.00;

personal wearing apparel valued at $1,330.00; a 1971 VD Convertible valued at $1,500.00; one-half interest in a 1981 VD Jetta valued at $1,700.00; moneys of $1,000.00 in cash or on deposit; 175 shares of Bon Voyage Travel, Inc., an Oklahoma corporation valued at $175.00 in which Debtor has a 35% ownership interest and Mrs. Goodson has a 65% ownership interest, Statement of Financial Affairs, p. 1; 164.7354 shares of The Williams Companies BESOP valued at $4,941.00 but "unavailable for distribution until retirement or termination;" [and,] 195.079 shares of The Williams Companies ESOP valued at $5,852.00 but "unavailable for withdrawal for 7 years following deposit;" and The Williams Companies Pension Plan whose value is unknown, Schedule B–1, B–2, B–3, B–4.

10. The Trustee filed his report of no distribution on September 20, 1989.

11. Debtor's initial "Schedule of Current Income and Expenditures" filed with his petition reported Mr. Goodson's "net monthly income" as $4,296.00 and Mrs. Goodson's "net monthly income" as $177.00 for a total "net" income of $4,473.00; and expenses of $4,409.00; for a net excess of income over expenses of $64.00 per month.

12. Any recitations elsewhere in this opinion which should be included among "Findings of Fact" are incorporated herein by reference.

### CONCLUSIONS OF LAW

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (O), 11 U.S.C. § 707(b).

The U.S. Trustee moves that this Ch. 7 bankruptcy case be dismissed pursuant to 11 U.S.C. § 707(b). This statute provides as follows:

> After notice and a hearing, the court, on its own motion or on a motion by the United States Trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are *primarily consumer debts* if it finds that the granting of

relief would be a *substantial abuse* of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor. (Emphasis added)

Application of the statute involves two main issues or areas of inquiry: whether debts are "primarily consumer debts," and if they are, whether a "substantial abuse" of 11 U.S.C. Chapter 7 exists.

■ Whether debts are "primarily consumer debts" depends on the purpose of the debts, *In re Cook*, 110 B.R. 544, 546 (Bankr.N.D.Okla.1990).

Debtor's Schedule A–2 lists secured debts of $98,791.00, including $92,000.00 owed on a home mortgage, and $6,791.00 on two motor vehicles. Schedule A–3 lists unsecured debts of $49,426.91, including $29,826.91 owed on nine different credit cards, $9,600.00 on a signature line of credit, and $10,000.00 on two student loans.

To determine the purpose of the above listed debts, the Court first looks to the Debtor's Schedules A–2 and A–3 to see what the Debtor stated as each debt's purpose. Here, the Debtor listed "consumer debt" on all nine credit cards. No particular notation was made as to the purpose of the signature line of credit from Williams Employees Credit Union. After the U.S. Trustee filed her Motion to Dismiss, however, the Debtor filed a Trial Brief wherein he asserted that the actual purpose of the credit card and signature line of credit debts was to cover business losses incurred by the family business known as Bon Voyage Travel, Inc. (hereinafter "the Travel Agency"), Debtor's Trial Brief at p. 3. Debtor claimed that the Travel Agency business losses were $2,057.00 in 1985, $10,663.00 in 1986, $5,555.00 in 1987, and $7,737.00 in 1988. *Id.* According to Debtor, the business losses were covered "by borrowing a total of $25,275.00, from 1985 to 1988, from his credit card accounts (Cash Advances) and from a line of credit at the Williams Employee Credit Union (WECU Loan)." *Id.* The $25,275.00 allegedly used to cover "business losses" makes up 64% of the total of $39,426.91 owed on the credit cards and on the signature line of credit.

The last two unsecured debts listed on Debtor's Schedule A–3 are for educational loans totaling $10,000.00. At the time of filing of Debtor's Chapter 7 petition, educational loans were nondischargeable in Chapter 7 unless the debtor could show undue hardship, 11 U.S.C. § 523(a)(8)(B); but were normally dischargeable in Chapter 13 (although amendments to the Bankruptcy Code in 1990 adopted the same nondischargeability standard used in Chapter 7 for educational loans under Chapter 13 plans, 11 U.S.C. § 1328(a)(2)). In the case at bar, there is little indication of undue hardship, and thus, even if the Court were to grant the Debtor Chapter 7 relief, the Debtor would continue to be held responsible for the $10,000.00 in educational loans.

■ The Debtor's secured debts involve his home mortgage and two motor vehicles. As to the home mortgage, this Court has held on at least two previous occasions that a home mortgage is a consumer debt for the purposes of 11 U.S.C. 707(b), *In re Cook*, 110 B.R. at 546; *In re Higginbotham*, 111 B.R. 955, 960 (Bankr. N.D.Okla.1990). The debts secured by the two motor vehicles appear to be purchase-money obligations for family cars and as such are clearly consumer debts.

■ Here, the total debt owed by Debtor, both secured and unsecured, is $148,217.91. Of that, only $25,275.00, or approximately 17% of the total debt is now alleged to be business debt. The $10,000.00 in educational loans accounts for approximately 7% of the total debt. The $92,000.00 home mortgage, $6,791.00 in car loans, and additional $14,151.91 on credit cards and signature line of credit (not claimed as business debts) account for 76% of the total debt.

■ The number of creditors to whom the alleged business debts are owed is not clear, since the Debtor did not provide a list of which of the nine credit cards he used when making cash advances to pay off the business losses of the Travel Agency. It is clear, however, that most of the amount of debt is consumer debt, and a large, though

indeterminate number of creditors, are consumer-debt creditors. Although there is a presumption in favor of granting the debtor the relief he requests, that presumption "goes to the merits of the propriety of relief under Chapter 7 and not to the applicability of 11 U.S.C. § 707(b) itself", *In re Higginbotham*, 111 B.R. at 960. In any event, the facts here are sufficient to dispose of any presumption. This Debtor's debts are primarily consumer debts.

There is serious question whether § 707(b) can be read as a restriction on review for abuse of non-consumer bankruptcy cases. This question need not be taken up here, since this is a consumer-debt case. See *In re Higginbotham*, 111 B.R. at 966. The Court proceeds to consider whether this case is a "substantial abuse" of 11 U.S.C. Chapter 7.

■ Substantial abuse is not defined by the Bankruptcy Code. This Court has held that a substantial abuse of Ch. 7 may exist where

> ... the debtors have disregarded their duty to accurately disclose their general financial position to the Court; and ... have substantially overstated their monthly expenses which misrepresents their financial picture and the monthly expenses are unreasonable.

*In re Cook*, 110 B.R. at 548. This Court has also held that "a 'substantial abuse would seem to include that situation wherein relief under Chapter 7 is unnecessarily prejudicial to creditors," as indicated by such factors as

> ... there is no apparent emergency, disaster or untenable situation to be remedied—relief under Chapter 13 is available, is not unduly burdensome to debtors, and would result in repayment of all or most of debtors' outstanding debt within the term of a Chapter 13 plan—while Chapter 7 relief would result in little or no dividend to creditors and would amount to a reward for debtors' own lack of diligence or judicial blessing of an unconscionably one-sided, opportunistic adjustment of the debtor-creditor relationship.

*In re Higginbotham*, 111 B.R. at 964. All of these factors are to be taken together in determining whether a particular Ch. 7 case is abusive and deserves dismissal.

The first main factor bearing on "substantial abuse" is whether the debtor misrepresented his financial position to the Court. This can be done by understating one's income, or conversely by overstating one's expenses, *In re Cook*, 110 B.R. at 546. Debtor alleges that his expenses are "historical" and provable, Debtor's Trial Brief at 6. But a Debtor's expenses, though real, may be improvidently high. Here, the U.S. Trustee has objected to the following expenses which she believes are overstated or excessive:

| | |
|---|---|
| Routine home maintenance | $ 100.00 |
| Clothing | 200.00 |
| Auto insurance (per month) | 320.00 |
| Transportation (not including auto payments which total $438.00/month) | 500.00 |
| Recreation | 100.00 |
| Other payments for support of dependents not living at home | 750.00 |
| Other | 120.00 |
| | $2,090.00 |

There is no evidence in the record which warrants the need of a $100.00 monthly allowance for home maintenance.

The second monthly expense the Trustee objects to is $200.00 for clothing. A debtor who is current on his bills and expenses can spend as much as he likes on clothing. But when a debtor is suffering financial difficulty, he should tighten the belt he is wearing instead of buying a new one.

The third monthly expense the Trustee objects to is $320.00 for auto insurance. The family insures four cars. Although this may be a real expense, this Court finds it to be improvidently high. The fourth contested expense is the transportation costs of the family—$500.00 a month. The gasoline credit card records submitted by the debtor at his hearing do not come close to this monthly figure. It appears to this Court that the Debtor is "puffing" his transportation expenses.

Recreation of $100.00 is the fifth expense the Trustee contests. Again, just as with the clothing expenses, when in the midst of

a financial crunch, the debtor should cut down on his entertaining and recreation that costs money which could be used to repay his creditors.

A sixth monthly expense challenged by the Trustee is the payment of support of dependents not living at home—$750.00/month. There is no testimony that this amount is going to pay the children's college tuition, books, or room and board. Student loans have been secured for those expenses. It appears that the $750.00 is being sent directly to the son and daughter for use at their discretion. Even if this expense is real, it is improvident and unreasonable under the circumstances, for reasons to be discussed below.

The final monthly expense at issue is the $120.00 listed as "other." The testimony at trial was that the $120.00 was spent to pay $53.00 on a student loan (not listed above); $25.00 on an unsecured credit union loan (presumably in wife's name); and $40.00 to Citicorp for credit card (also presumably in wife's name). This being the case, the three above creditors are being preferred over all other creditors. This is unacceptable.

The second main factor bearing on "substantial abuse" is whether relief under Ch. 7 would be unnecessarily prejudicial to creditors, as indicated by various lesser factors such as the presence (or absence) of a crisis in debtor's recent financial history, the availability of relief under Chs. 11 or 13, and the effect of relief under Chs. 11 or 13 as compared with relief under Ch. 7.

Here, the Debtor did have quadruple bypass surgery in the Fall of 1986. Health insurance, however, covered most of the medical costs leaving only $1,250.00 for the Debtor to pay. The Debtor's salary for 1986 was $64,758.00. A $1,250.00 medical bill could not possibly be considered a financial emergency, disaster or untenable situation for an individual whose income was approximately $65,000.00.

Although the Debtor's son started college in the Fall of 1986, this also cannot be seen as an emergency, disaster, or untenable situation. Debtor has known for several years, at least eighteen, that he might one day be called upon to finance his son's college education. If the $1,250.00 in medical bills depleted the Debtor's entire remaining savings which he had intended to use for his son's first year college expenses (Debtor's Trial Brief at 4), then the Debtor had not been planning very seriously, or for very long, to help finance his son's education. Moreover, when it comes time for a child to attend college, if sufficient finances are not in savings, then it is time for the family to change its lifestyle until such a time as the child graduates or drops-out of college. A debtor does not have the right to force his creditors to donate to his children's education.

The Debtor's greatest business loss, $10,663.00, did occur in 1986. This business loss could be seen as an emergency, disaster, or untenable situation for a Debtor whose annual income was much lower or whose annual income would be significantly less in the foreseeable future. But the Debtor's salary in 1986 was almost $65,000.00, and in 1987, the Debtor's salary was $66,428.00. Debtor's estimated salary for 1988 and 1989 is $74,000.00. The business losses in 1985, 1987, and 1988 were considerably less. Further, the Debtor waited two years after the 1986 business losses to file for Chapter 7 relief. It was not until after seeking professional financial counseling in 1988 from a financial consultant who advised Debtor that it was "impossible for [Debtor] to provide for his family and still service his credit card debts or the WECU loan in any amount," that Debtor sought the counsel of his present attorney who advised that it was impractical for the Debtor to propose a meaningful Chapter 13 plan and still provide for his family, Debtor's Trial Brief at 6. Thereafter, this Chapter 7 petition was filed. This Court agrees that it is "impossible" to maintain this Debtor's preferred standard of living and simultaneously to pay off medical bills, put children through college, and pay off business losses. This Court also agrees that it is "impractical" for this Debtor to maintain his preferred standard of living, put children through college, and propose a meaningful Chapter 13 plan.

This Court, however, is not here to reward the debtor who is ambitious and improvident with a "head start," but rather to give the "honest but unfortunate debtor" a "fresh start," *Grogan v. Garner,* —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), following *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934).

Debtor admits to "deficit spending" but blames the commercial credit industry for luring debtors in over their heads with endless credit, Debtor's Trial Brief at 4 & 5. Debtor restructured his debts in 1978 and again in 1986 by using the equity that he had accrued in his homestead, which amounted to $25,000 in 1978 and $35,000 in 1986, Debtor's Trial Brief at 5. Additionally, Debtor claims he destroyed all his credit cards in 1986 in "an attempt to prevent his return to deficit spending" but was "forced to reactivate his credit cards" because of the 1986 setbacks. Debtor's Trial Brief at 6 & 7. The facts show that this Debtor has a history of living beyond his means. This is the third time in ten years that this Debtor has had to take drastic measures to save himself from accumulated debts. On this third occasion, instead of doing as Debtor has done on the past two occasions and using the accrued equity in his homestead to pay off his debts, Debtor has chosen to shift the burden of his own ambition and improvidence onto his creditors, and let them pay his "efforts to support his family, and to provide for his future financial condition," Debtor's Trial Brief at 6. As to "deficit spending," the Court wonders why the Debtor does not accept responsibility for his own actions and adopt the popular ad campaign slogan "Just Say No."

Debtor is eligible for Chapter 13 if his secured debts are less than $350,000.00 and his unsecured debts are less than $100,000.00, 11 U.S.C. § 109(e). Here, Debtor's Schedules A–2 and A–3 confirm that Debtor is eligible for Chapter 13.

Chapter 13 must not be unduly burdensome to the Debtor. If debtor's future income appears to be sufficient to fund a Chapter 13 plan then there would be no undue burden placed on the debtor. Here, Debtor's estimated income for 1988 and 1989 is $74,000.00. His income may well continue to rise in the future. Debtor's Schedule of Current Income and Expenditures filed in October, 1988, shows a monthly excess of $64.00; but this low figure is due solely to Debtor's excessive and improvident expenses, and could be greatly increased by sensible economies. From the facts, it appears that a Chapter 13 plan would not be unduly burdensome to this Debtor.

If such sensible economies were adopted and Debtor's disposable income realized, at least a substantial portion of both secured and unsecured debts could be repaid.

Here, the only tangible assets of the Debtor are his homestead and two cars, all of which are secured. In Ch. 7 liquidation, the unsecured creditors would get absolutely nothing.

Here, the Court has before it an upper-middle class white-collar worker who has little or no self-control and begs for the Court to condone his excesses. When other alternatives are available, as in this case, it would be unconscionable for this Court to grant the Debtor a discharge of his debts pursuant to Chapter 7.

All the factors taken into account as listed above lead this Court to conclude that this Debtor found that his goals and ambitions could not be reconciled with his means, and thus, he chose to call on this Court to force an adjustment at his creditors' expense. This Court declines to do so. In refusing to grant affirmative relief in Ch. 7, this Court leaves Debtor where he put himself. The Debtor should not be allowed to impose his values upon his creditors when he is making no effort to "tighten his belt" and maintain a conservative lifestyle. To do otherwise would be to give the Debtor a "head start."

This Court concludes that this Debtor has substantially abused the Bankruptcy Chapter 7 privilege. Accordingly, the U.S. Trustee's "Motion to Dismiss ..." is granted, effective upon entry of this Order. The foregoing shall constitute the findings of

fact and conclusions of law as contemplated by F.R.B.P. 7052.

AND IT IS SO ORDERED.