**In re Ronald Joe HENRICKSEN and Mary Elizabeth Henricksen, a/k/a Mary Beth Potts, Debtor.**

**Bankruptcy No. 90–02813–W.**

United States Bankruptcy Court, N.D. Oklahoma.

Sept. 3, 1991.

T. Reid Young, Tulsa, Okl., for debtor.

Lonnie D. Eck, Tulsa, Okl., Trustee.

## ORDER DENYING CONFIRMATION OF PLAN

MICKEY DAN WILSON, Bankruptcy Judge.

On March 20 and March 28, 1991, the Court held hearings on confirmation of a Ch. 13 plan in the above-styled case; thereafter, the matter was taken under advisement. Upon consideration of the record herein, the Court finds, concludes and orders as follows.

### FINDINGS OF FACT

On September 25, 1990, Ronald Joe Henricksen and Mary Elizabeth Henricksen ("Mr. Henricksen;" "Mrs. Henricksen;" "debtors") filed in this Court their voluntary petition commencing a case under 11 U.S.C. Chapter 7 ("Ch. 7"). Kenneth L. Stainer was appointed Trustee in this Ch. 7 case ("the Ch. 7 Trustee"), under the general supervision of the assistant United States Trustee serving in this judicial District ("the UST").

With their petition, debtors filed their schedules A–2, B–1 and B–2, and their statements of intention with respect to consumer collateral and of executory contracts. These documents indicated debtors' ownership of real property valued at $25,000.00 which was mortgaged to secure a debt to Mortgage Clearing Corp. of $50,572.27, but was in foreclosure and would be surrendered to said creditor. Debtors had already moved their household, and were now living in another home leased for one year. Debtors also reported ownership of a refrigerator, stereo and TV valued at $600.00 which secured a debt to Sears Payment Center of $2,172.24 and would be surrendered to said creditor; a "Wing Back Chair, Swivel Bar Stool [and unspecified] Art & Furniture" valued at $700.00 which secured debts to Norwest Financial totaling $2,378.20, of which the chair and stool valued at $300.00 would be surrendered to said creditor while the other "Art & Furniture" valued at $400.00 would be retained and the debt secured thereby of $1,230.20 would be reaffirmed; and three motor vehicles—a 1988 Ford Taurus valued at $5,000.00 which secured a debt to Ford Motor Credit Co. of $8,586.87, a 1988 Suzuki valued at $4,000.00 which secured a debt to General Motors Acceptance Corp. of $4,853.28, and a 1981 Fiat Spider valued at $750.00 which secured a debt to Oil Capitol Federal Credit Union of $1,031.49—all of which vehicles would be retained and debts secured thereby totaling $14,471.64 would be reaffirmed. Debtors' secured debts totaled $64,741.00. Debtors also reported ownership of a fourth motor vehicle—a 1977 Buick Skylark valued at $250.00 and held free and clear of liens—and some other items of personalty, of no great value except as noted below. Debtors also filed their Schedule B–4, which

claimed as exempt pursuant to 11 U.S.C. § 522(b), 31 O.S. § 1(A) the 1988 Ford Taurus, the 1988 Suzuki, and most of their property not subject to security interests except for the 1977 Buick Skylark valued at only $250, "Stocks ..." valued at $500, Schedule B–2(t), and $75 worth of unspecified "Tangible personal property of any other description," Schedule B–2(m).

Debtors' Schedule A–3 reported unsecured debts totaling $13,501.14 owed to 30 different creditors, not including the anticipated deficiency after foreclosure by Mortgage Clearing Corp. of some $25,000.00. The largest unsecured debts were $3,294 owed to Oil Capitol Federal Credit Union, presumably on an unsecured loan, $2,812.37 owed to "Discover," presumably the credit-card company of that name, $1,000 owed to "VISA—United Bank—Globe," $985.13 owed to "VISA—Oil Capitol," $970 owed to "VISA—Chase," and $875 owed to "Foleys ... Houston, TX," a luxury department store. The remaining unsecured debts were miscellaneous credit card and other charges, utility bills, some small medical bills, bills from publishers such as "Newsweek" and "Publishers Clearing House," etc. All of these debts were incurred in 1989–1990, except for Mastercard charges of $323.57 accrued by "approx. mid 1987." Exactly what most of the unsecured debts were incurred for does not appear.

With their petition, debtors also filed their Schedule B–3, reporting their ownership of two "IRA[s]," one identified as "Stifel Nicholaus Co." and valued at $12,000.00, the other identified as "Eppler Guerin & Turner, Inc." and valued at $1,780.89. Debtors' Schedule B–4 claimed the larger IRA exempt to Mr. Henricksen, and the smaller IRA exempt to Mrs. Henricksen, pursuant to 31 O.S. § 1(A)(20).

With their petition, debtors also filed various statements and schedules reporting that both debtors were and apparently would continue to be employed; that debtors' joint gross income was $5,287.52 per month, with wage deductions of $1,468.20 per month for taxes and social security, $139.52 per month for insurance, and

$10.00 per month for "Credit Union," leaving take-home income of $3,919.80 per month; and that debtors' expenses were $4,110.29 per month, including $775.00 for rent, $430.00 for utilities, $120.00 for telephone, $29.00 for "Cablevision," $300.00 for food, $275.00 for clothing, $95.00 for laundry, $65.00 for newspapers and books, $60.00 for medical expenses, $139.52 for health insurance (compare the wage deduction of $139.52 for insurance), $182.68 for auto insurance and $32.00 for life and renter's insurance, $85.00 for transportation expenses, $125.00 for recreation, $50.00 for charitable contributions, $80.00 for home maintenance, $543.09 for automobile installment payments and $65.00 for unspecified "other" installment payments.

On November 15, 1990, the Ch. 7 Trustee objected to Mr. Henricksen's claim of exemption of the larger IRA. The matter was set for hearing on December 21, 1990, and then continued to January 10, 1991. On December 5, 1990, the UST moved to dismiss debtors' case pursuant to 11 U.S.C. § 707(b) as a substantial abuse of Ch. 7. The matter was set for hearing on January 10, 1991.

On January 10, 1991, debtors converted their Ch. 7 case to a case under 11 U.S.C. Chapter 13 ("Ch. 13"). Hearings on the Ch. 7 Trustee's objection to exemption and the UST's motion to dismiss were stricken as moot. The Ch. 7 Trustee was succeeded by Lonnie D. Eck, standing Trustee in Ch. 13 cases in this District ("the Ch. 13 Trustee").

On January 25, 1991, debtors filed their "Chapter 13 Statement" and "Proposed Chapter 13 Plan."

Debtors' Ch. 13 statement adopts debtors' Ch. 7 schedules of debts and assets, but adds thereto post-petition medical debts totaling $5,928.94 and (for unexplained reasons) subtracts therefrom miscellaneous unsecured debts totaling $981.43, for a net increase in unsecured debts to a total of over $18,000.00. However, debtors' Ch. 13 plan proposes to pay "an undetermined portion (estimated @ 80%)" of the new medical debt from insurance proceeds, leaving "approximately $1,185.78" in unpaid new medi-

cal debts to be added to other unsecured debt. Debtors' Ch. 13 plan proposes to surrender the $25,000.00 house already in foreclosure, but "in full satisfaction of this debt" of $50,572.27; and proposes that debtors retain all of the furniture, artwork and household goods and all four vehicles, and pay the present value of the collateral items plus 10% interest to the secured creditors in 24 months under the Ch. 13 plan, with deficiency amounts relegated to unsecured status pursuant to 11 U.S.C. § 506(a). Part of Norwest's security interest would be avoided pursuant to 11 U.S.C. § 522(f) and also reduced to unsecured status. Although debtors' short plan does not refer to stocks, Schedule B–2(t), or nondescript tangibles, Schedule B–2(m), it appears that debtors intend to retain such items, since the plan does not specify any disposition of such property valued at $575. Although debtors' short plan does not refer to any retirement funds, it appears that debtors intend to retain any such funds, since debtors' budget includes wage deductions for a "401 K" (see below) and the plan does not specify any disposition of the IRAs valued at almost $14,000.00.

Debtors' Ch. 13 statement proposes a budget including monthly wage deductions of $139.52 for insurance and $46.00 for "401 K," leaving take-home income of $3,919.80; but said income includes $250.00 per month from an unspecified source which "ends 7/91." Debtors' monthly expenses include $775.00 for rent, $185.00 for utilities, $65.00 for "heat," $75.00 for water, $85.00 for telephone, $415.00 for food, $175.00 for clothing, $95.00 for laundry, $65.00 for newspapers and books, $125.00 for medical expenses, $257.00 for auto insurance and $32.00 for "other insurance not deducted from wages," $120.00 for transportation expenses including maintenance, $125.00 for recreation, $2.00 dues for "Knights of Columbus," $65.00 for "Tags & licenses," $220.00 for "Other payments for support of dependents not living at home," $50.00 for charitable contributions, and $80.00 for "Maintenance of home," for total expenses of $3,011.00 per month. Before "7/91," at least, debtors would have an excess of income over expenses of $908.80 per month.

Mr. Henricksen has a son by a previous marriage, named Roger Henricksen, who is twenty years old and lives apart from debtors outside Tulsa. Mrs. Henricksen has two children by a previous marriage, namely Jeff [Potts?], who is twenty years old and is presently a college student attending the University of Oklahoma in Norman, Oklahoma, and Amanda Potts, who is a high school student attending a private parochial school, Holland Hall School, in Tulsa. Debtors' budget expense of $220.00 per month for "Other payments for support of dependents not living at home" goes to Jeff in college; and the 1988 Suzuki vehicle which debtors own, license and pay for is actually used by Jeff at college. Who pays Amanda's tuition does not appear.

Debtors' Ch. 13 plan proposes that debtors make payments to the Ch. 13 Trustee of $800.00 per month for 36 months. This sum apparently does not include debtors' monthly rent, which would be paid by debtors directly to their lessor in a manner described in bankruptcy shop talk as "outside the plan." Of the $800.00 per month paid "inside the plan," $80.00 per month would be retained by the Ch. 13 Trustee as his statutory fee, see 28 U.S.C. § 586(e); the rest would be paid by the Ch. 13 Trustee to secured and unsecured creditors. For 24 months, a total of $488.76 per month would be paid to various secured creditors, representing the value of their collateral plus 10% interest, as follows:

| Ford Motor Credit Corp. | 1988 Ford Taurus | $5,000.00 (value of vehicle) | 10% | $229.47 × 24 = $5,507.49 |
| GMAC | 1988 Suzuki | $4,000.00 (value of vehicle) | 10% | $183.58 × 24 = $4,405.99 |

| Oil Capitol | 1981 Fiat Spider | $ 750.00 (value of sec. prop) | 10% | $ 34.42 × 24 = $826.12 |
|---|---|---|---|---|
| Norwest Financial | Wingback Chair | $ 300.00 (value of sec. prop) | 10% | $ 13.76 × 24 = $330.44 |
| Sears | PMSI Refrig. Stereo, TV | $ 600.00 | 10% | $ 27.53 × 24 = $660.89 |

For 24 months, the balance of $231.24 per month would be paid on unsecured claims, including deficiency claims of undersecured creditors other than Mortgage Clearing Corp. For the last 12 months, no payments would be made on secured claims, and the balance of $720.00 would be paid on unsecured claims. After making adjustments for new medical debts, anticipated insurance payments, lien avoidance and relegation to unsecured status, debtors' total unsecured debt is approximately $22,000.00. Debtors' plan would pay these unsecureds a total of $14,189.76 or 64% of unsecured claims. Debtors calculate the same as "approximately 53%." However, when the $25,000 foreclosure deficiency of Mortgage Clearing Corp. is included, debtors' plan would repay no more than 30% of total unsecured debt.

As noted above, debtors valued the 1981 Fiat Spider at only $750. Oil Capitol Federal Credit Union objected to this valuation. At hearing, and upon agreement of debtors and Oil Capitol Federal Credit Union, the Court valued this vehicle at $2,950. Debtors thereupon agreed "that said vehicle be delivered to Oil Capitol Federal Credit Union ...", order of April 9, 1991 p. 1. The Court considers debtors' proposed Ch. 13 plan to be modified accordingly.

## CONCLUSIONS OF LAW

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), 11 U.S.C. § 1325.

 11 U.S.C. § 1325(a) provides that "... the court shall confirm a plan if— ... (3) the plan has been proposed in good faith ..." Debtors, as proponents of the plan, have the burden of establishing that the plan has been proposed in good faith, *In re Caldwell*, 895 F.2d 1123, 1126 (6th Circ. 1990); and it is the Court's independent duty to determine whether a Ch. 13 plan has been proposed in good faith, even absent any objection to confirmation of the plan, *In re Girdaukas*, 92 B.R. 373 (B.C., E.D.Wis.1988). Absent objection, "the court *may* determine that the plan has been proposed in good faith ... without receiving evidence on such issue ...," F.R.B.P. 3020(b)(2) (emphasis added). This discretionary procedural option does not relieve the debtors from their duty of proposing a plan in good faith or the Court from its responsibility of enforcing the requirement of 11 U.S.C. § 1325(a)(3), *In re Cash*, 51 B.R. 927, 930 (B.C., N.D.Ala.1985). "... '[S]uch an independent determination [by the court] that statutory standards [of good faith, etc.] have been met is the best assurance of the protection of creditors' interests,'" *In re Jernigan*, 130 B.R. 879, 891 (B.C., N.D.Okl.1991), quoting *Report of the Commission on the Bankruptcy Laws of the United States, July 1973* (93d Cong., 1st Sess.), Part I, p. 162.

One of the basic purposes of bankruptcy law is to provide a " 'fresh start' " for the " 'honest but unfortunate debtor,' " *Grogan v. Garner*, — U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755, 765 (1991), paraphrasing and quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). This Court has held that the purpose of Ch. 13 in particular is to provide debtors hard-pressed by their creditors with an opportunity to repay their debts insofar as practicable, and accordingly that

... "[G]ood faith" in Ch. 13 means debtor's attempt to restore normal financial relations with creditors, to the extent reasonably feasible under the circumstances. Both debts and assets, creditors' interest and debtors' interest, must be taken into account and fairly accommodated. What is "fair enough" may be a range of permissible alternatives rather than a single "right" way, and will vary according to circumstances; but there must be a reasonable balancing of interests and minimization of harm,

*In re Jernigan,* supra, pp. 893–94. The Court further held that "Entering bankruptcy does not excuse a debtor from ordinary prudence," *id.* p. 896; and that a plan which "would have debtor disregard ordinary prudence ... to the end of profiteering and debt avoidance rather than debt repayment" was not in good faith, *id.* p. 896. Such determinations must be made by weighing all relevant, material facts and circumstances in each case, *id.* pp. 891, 892–93 citing *Flygare v. Boulden,* 709 F.2d 1344, 1347–1348 (10th Cir.1983) and *In re Rasmussen,* 888 F.2d 703, 705–706 (10th Cir.1989).

■ In short, in 11 U.S.C. § 1325(a)(3) "good faith" means ordinary prudence in search of a fair chance. The question now before this Court is whether debtors' proposed plan meets this basic standard.

■ Debtors did not file this case under Ch. 13 but under Ch. 7, with the obvious intention of discharging their unsecured debts while keeping most of their assets and paying nothing from their future income. Debtors were urged into Ch. 13 only by the combined opposition of the Ch. 7 Trustee and the UST to debtors' course in Ch. 7.

■ Debtors' plan would repay somewhere between 30% and 64% of unsecured debt. Many Ch. 13 plans repay less than that. But, just as there is no arbitrary minimum repayment necessary to establish "good faith," *In re Jernigan,* supra, pp. 892–93 citing *Flygare v. Boulden,* 709 F.2d 1344 (10th Circ.1983) and *In re Rasmussen,* 888 F.2d 703 (10th Circ.1989), so there is no arbitrary maximum repayment which necessarily establishes "good faith." The Court must consider all of the circumstances; and the percentage of unsecured debt to be repaid, small or large, is only one such circumstance.

■ In Ch. 13, debtors originally proposed to keep most or all of their assets, including four motor vehicles (or one vehicle for every member of the family except one apparently independent son). Debtors were forced by Ch. 13's requirements to pay secured creditors the value of collateral items, 11 U.S.C. §§ 506(a), 1324(a)(5); but debtors proposed an extremely low valuation for at least one such item, the 1988 Suzuki. When the Court determined that said item was actually worth almost four times debtors' estimated value, debtors only then agreed to give up said item. Debtors continue to hold enough cash in IRAs to pay all of their original unsecured debts, and appear to be building up yet more cash reserve for themselves in a "401 K." Ch. 13 may be used to protect assets, but not in complete disregard of debtors' duties and creditors' interests, *In re Jernigan,* supra, pp. 890–91, 894, 895–96. Protection of retirement funds is understandable; but so-called retirement funds are often little different from ordinary bank accounts, *In re Ree,* 114 B.R. 286 (B.C., N.D.Okl.1990), *In re Garrison,* 108 B.R. 760 (B.C., N.D.Okl. 1989), *In re Goldberg,* 59 B.R. 201 (B.C., N.D.Okl.1986); and debtors should not use bankruptcy law so as to force their creditors to contribute to debtors' retirement funds. Bankruptcy is intended to provide debtors with a fresh start, not with a fine finish. It is possible that, notwithstanding the Ch. 7 Trustee's objection, the debtors' retirement funds herein are exempt, see *In re Ridgway,* 108 B.R. 294 (B.C., N.D.Okl. 1989). "The Court may not deny exemptions prescribed by the Legislature ... but the Court *may* consider debtors' disposition of any and all of their property, exempt or otherwise, as part of [a] pattern of legal and economic behavior ...," *In re Higginbotham,* 111 B.R. 955, 965 (B.C., N.D.Okl.1990) (emphasis original).

Debtors' budget indicates an excess of income over expenses of $908.80 per month, yet debtors propose to contribute only $800 per month to their Ch. 13 plan. After "7/91," debtors anticipate a decrease in income of $250 per month, although the reason for this is not clear. At least, from the filing of this case in September 1990 until July 1991, the additional income might have been made available to creditors; but debtors preferred to keep it for themselves. Debtors do not propose to repair this lost opportunity by extending the term of their plan beyond the usual 36–month period, see 11 U.S.C. § 1322(c). But debtors are prepared to let the delay work to their own advantage, by including medical debts incurred post-petition but pre-conversion among the unsecured debts to be discharged in Ch. 13.

Debtors originally overstated their monthly expenses in the Ch. 7 statement. They reduced their stated expenses somewhat in their Ch. 13 statement, yet said expenses still appear somewhat inflated, e.g. $175 per month for clothing, not counting $95 per month for laundry; $125 per month for medical expenses not covered by insurance; $80 per month for home repair; and $65 per month for newspapers. Such expenses might be somewhat reduced; but the Court is mindful that, after "7/19," debtors' income decreases as well.

Debtors' expenses include $220.00 per month for support of their adult son Jeff at college, as well as license and installment payments on a 1988 Suzuki used by Jeff at college. Education of one's children is a great thing—if one can afford it. Not everyone can afford it; and many people do not go to college, or postpone entry into college, or do not drive cars at college, or do without "spending money" at college, or must work their own way through college, or must incur educational loans, because their parents cannot afford to pay their way for them. These debtors cannot afford it either; yet they propose to use bankruptcy law to make it affordable—in effect, they would use bankruptcy to make their creditors pay their son's way in college. Bankruptcy law is intended to assist debtors whose efforts to finance education

result in "undue hardship," 11 U.S.C. §§ 523(a)(8), 1328(a)(2); but it is not intended to provide a mechanism for forcing involuntary student loans—or, rather, student gifts—on creditors who are not in the business of financing education. See *In re Goodson,* 130 B.R. 897, 900 (Bkrtcy. N.D.Okl.1991).

Some of these facts and circumstances, considered in isolation, might be innocuous or excusable or *de minimis.* But they are to be taken together, *In re Jernigan,* supra, *Flygare v. Boulden,* supra, *In re Rasmussen,* supra. When they are taken together, the accumulation of credit charges and other unsecured debts for no obvious reason while also accumulating retirement funds *plus* prior resort to Ch. 7 at a time when debtors' income was actually higher *plus* exaggeration of expenses *plus* slighting of obligation to secured creditors *plus* relatively short term of the Ch. 13 plan *plus* retention of IRAs *plus* 401 K *plus* stock and other assets *plus* four vehicles (reduced to three, but only under pressure) *plus* support of an adult child in college with spending money and a car, add up to this: a pattern of living beyond ordinary means, resorting to bankruptcy to cut debts rather than repay them and to force creditors to pay for debtors' own retirement and their son's higher education. Throughout this case, debtors have manifested their intention to use bankruptcy to get and keep as much, and pay as little, as they possibly can. Their proposed Ch. 13 plan is merely the latest embodiment of this attitude. This is an attempt to use Ch. 13, not to get even, but to get ahead. Here is not ordinary prudence in search of a fair chance, but merely improvident ambition in search of an excuse. A Ch. 13 plan designed, as this one is, to serve such an attitude, is not proposed in good faith, and cannot be confirmed under 11 U.S.C. § 1325(a)(3).

In *In re Jernigan,* supra, this Court held that a Ch. 13 plan which proposed that debtors use avoiding powers normally used only by Trustees would be required to meet a heightened standard of "good faith" appropriate to a Trustee's fiduciary duty and

responsibility. That case dealt with powers expressly conferred on Trustees to avoid or subordinate security interests for the benefit of bankruptcy estates under, e.g., 11 U.S.C. §§ 544(a), 547. The plan now before this Court does not invoke precisely the same powers. But it does invoke 11 U.S.C. § 506(a) to bifurcate undersecured claims and to relegate the unsecured portion of such claims to unsecured status. Although § 506(a) does not expressly mention "Trustees," it has been held to be a power properly usable on behalf of bankruptcy estates and not for debtors' individual benefit apart from bankruptcy estates, *In re Dewsnup*, 908 F.2d 588 (10th Circ.1990), cert. granted — U.S. ——, 111 S.Ct. 949, 112 L.Ed.2d 1038 (1991). This suggests that Ch. 13 plans invoking § 506(a) should also be held to a heightened, fiduciary-like standard of "good faith." Since the plan now before this Court does not even meet the basic ordinary-prudence standard of good faith, there is no need to consider whether any higher standard should be required.

Accordingly, confirmation of debtors' Ch. 13 plan must be, and is hereby, denied. However, debtors deserve an opportunity to amend their plan and make it confirmable in accordance with the opinions herein expressed. Debtors shall be granted seven (7) days within which to propose a second Chapter 13 plan (the Court notes the automatic stay has been in effect since January 10, 1991); and if no plan is proposed within the allotted time the case will be dismissed. If a second Chapter 13 plan is proposed the Court shall set a confirmation hearing after notice to parties-in-interest.

AND IT IS SO ORDERED.