**In re James K. JACOBS d/b/a Dangerfield & Jacobs Group, Debtor.**

**James K. JACOBS, Plaintiff,**

v.

**STATE OF OKLAHOMA, ex rel. Cathy J. WEATHERFORD, Insurance Commissioner, Defendant.**

Bankruptcy No. 91–04637–W.
Adv. No. 92–0265–W.

United States Bankruptcy Court, N.D. Oklahoma.

Jan. 29, 1993.

P. Gae Widdows, Howard and Widdows, P.C., Tulsa, OK, for plaintiff.

Lisa Gayle Minx–Bays, Asst. Gen. Counsel, Oklahoma Ins. Dept., Oklahoma City, OK, for defendant.

## MEMORANDUM OPINION AND ORDER

MICKEY DAN WILSON, Bankruptcy Judge.

This adversary proceeding was submitted for decision on stipulations and briefs. Upon consideration thereof, and of the record herein and in the above-styled case under 11 U.S.C. Chapter 7, whereof judicial notice is taken, the Court, pursuant to F.R.B.P. 7052, finds, concludes, and orders as follows.

## FINDINGS OF FACT

The State of Oklahoma's Insurance Commissioner ("the Commissioner") administers and enforces the Oklahoma Insurance Code, 36 O.S. §§ 101–6571 (Supp.1993), stips. ¶ 1.

On December 1, 1966, the Commissioner issued insurance agent license no. 198240 to James K. Jacobs ("Jacobs"), stips. ¶ 2.

Jacobs declared bankruptcy for the first time in 1972. The parties have not reviewed the record of that case; but "to the best of [Jacob's] recollection, he did not owe or discharge a[ny] debt to any insurance company in th[at] bankruptcy," stips. ¶ 3.

On February 11, 1985, Quaker Life Insurance Company ("Quaker") appointed Jacobs as its agent in Oklahoma, pursuant to 36 O.S. §§ 1421–1433 (Supp.1993), stips. ¶ 4.

On August 1, 1985, Jacobs together with one Gary Dangerfield ("Dangerfield"), as partners in the "Dangerfield & Jacobs Group" signed an Agency Representative Agreement with Quaker, and as individuals signed a Personal Guaranty in favor of Quaker, stips. ¶ 4 incorporating exhibits A, B and C. According to the Agency Representative Agreement, Quaker

> will pay [Jacobs and Dangerfield] first year and renewal commissions, service fees and other compensation in accordance with the current Compensation Schedule attached to and made a part of this agreement. All such compensation will be paid on policies issued from applications on which [Jacobs or Dangerfield] are designated as agent,

ex. A p. 1 ¶ III.A; and "Any advance or loan ... will constitute a general indebtedness by [Jacobs and Dangerfield] to [Quaker]," *id.* ¶ V.C. The "Compensation Schedule" is apparently a "Commission Schedule Supplement" and "Notes ..." thereto, which set forth commission amounts on various types of insurance policies, ex. B. According to the Personal Guaranty,

> [Jacobs and Dangerfield] do hereby personally guarantee the faithful performance and fulfillment of all obligations of Dangerfield & Jacobs Group pursuant to the terms of said Agency Representative Agreement and do further jointly and severally personally guarantee the payment by Dangerfield & Jacobs Group of any and all sums due or to become due to Quaker, and any and all damages that may arise in favor of Quaker in consequence of the non-performance by Dangerfield & Jacobs Group of the covenants and conditions of said ... Agreement,

ex. C. By this arrangement, Jacobs and Dangerfield "would be advanced monies

directly each month from Quaker while they called on various banks ... attempting to sell insurance," stips. ¶ 6.

In fact, "Quaker paid Dangerfield ... $1,500.00 ... per month for ten (10) months" totalling $15,000, "and Quaker paid [Jacobs] ... $1,100.00 ... per month for ten (10) months" totalling $11,000, for a combined total of $26,000, stips. ¶ 6.

On August 6, 1986, in Case No. CJ–86–7537, the District Court of Oklahoma County, Oklahoma adjudged Quaker to be insolvent, stips. ¶ 7. Said Court issued its Order Adopting and Implementing a Claim Procedure for Non–Policyholder Claims and a Notice To File Claims Against Quaker. Jacobs received his copies of said order and notice on or about October 2, 1986. Jacobs "did not file a[ny] claim for renewal commissions," because he "had written no insurance for Quaker and did not have any renewal commissions which he was due," stips. ¶ 8. Although the parties do not so stipulate, it appears that Dangerfield likewise made no claim against Quaker, had written no insurance for Quaker, and had no renewal commissions due from Quaker.

In short, Quaker paid a total of $26,000 to Jacobs and Dangerfield as an advance on commissions which Jacobs and Dangerfield never earned, which they were legally bound to repay.

On August 21, 1987, Maurice Cline, Assistant Receiver for Quaker ("Cline"), sent a letter to "Dangerfield–Jacobs Group/ Gary Dangerfield & Doug Jacobs," which noted "Balance Due: $26,000.00" and further stated as follows:

Enclosed is a copy of your final agent's statement. Please remit your check in payment of this balance promptly,

ex. D. Jacobs received the letter but made no payment, stips. ¶ 9.

On October 28, 1987, Cline sent another letter, similarly addressed, which stated as follows:

On August 21, 1987, I wrote concerning your balance of $26,000.00 with Quaker ... To date, I have received no response. Please remit your check by November 7, 1987. Otherwise, it will be necessary to turn this account to Counsel for further action,

ex. E. Jacobs received the letter but made no payment, stips. ¶ 9.

On November 19, 1987, Jeff L. Hartmann of Shdeed & Hartmann, as attorney for Quaker's Receiver, sent a letter to "Dangerfield–Jacobs Group/Mr. Gary Dangerfield/Mr. Doug Jacobs," which referenced "Agent's Debit Balance" and further stated as follows:

Your agent's account with Quaker ... has been referred to me for collection. The company's records reflect that as of August 13, 1986, your agent's balance due the company is $26,000.00.

I would request that you pay this balance within fifteen (15) days from the date of this letter. Should you not make satisfactory arrangements concerning your account within this time frame, the Receiver of Quaker ... through me as legal counsel, will commence appropriate action to collect this balance,

ex. F. Jacobs received the letter but made no payment, stips. ¶ 9.

On March 7, 1990, Miles L. Mitzner of Mitzner & Associates Inc., as attorney for Quaker's Receiver, sent a letter to "Mr. Doug Jacobs/dba Dangerfield–Jacobs Group," which referenced "Quaker ... In Receivership/Balance Due: $26,000.00" and further stated as follows:

Please be advised that your account has been referred to me for collection, by the Receiver of Quaker ... You are presently indebted to the Receivership in the amount listed above.

This letter is formal written notice of demand for the outstanding amount due to my client, Quaker ... in Receivership. Please remit $26,000.00 within 10 days from the date first written at the top of this letter or I have been asked to take further collection action against you, which may include filing suit against you and obtaining Judgment for the above captioned amount.

If you have any question regarding this letter or the amount claimed herein, please contact me immediately ... However, if your Cashiers Check, Money Or-

der or cash in the amount of $26,000.00 does not reach my office within the time period described above, I will take further action,

ex. G. Jacobs received the letter but made no payment, stips. ¶ 9.

On April 17, 1990, an almost identical letter, signed by B. Christopher Wray and headed "U.S. CERTIFIED MAIL/RETURN RECEIPT REQUESTED," was sent to Jacobs at a different street address, ex. H. Jacobs received the letter but made no payment, stips. ¶ 9.

Thereafter, Quaker's Receiver sued Jacobs and Dangerfield as individual co-defendants in Case No. CJ–90–4664 in the District Court for Oklahoma County, Oklahoma. On July 16, 1990, Quaker obtained default judgments against Jacobs and Dangerfield, jointly and severally, for $26,000.00 plus $2,600.00 in attorney fees, $73.00 in costs, and interest at the statutory rate, stips. ¶ 10 and ex. I.

On or about July 11, 1991, "Special Counsel for the Receiver for Quaker" notified the Commissioner "that the efforts to collect [Jacob's] debt to Quaker were being discontinued, and that [the Commissioner] could take any administrative action which was deemed appropriate," stips. ¶ 13. Administrative action against Jacobs was not immediately commenced. Said notice made no mention of Dangerfield; and it appears that Quaker continued to pursue its collection efforts against him.

Dangerfield was garnished. By this means, on September 10, 1991 Quaker was paid $3,427.90 on its judgment debt.

On September 30, 1991, the Commissioner by Lisa G. Bays of the State Insurance Department's Legal Division sent a letter to Jacobs, which stated as follows:

This letter is to notify you pursuant to 75 O.S. § 314(c) (1987) that the Oklahoma Insurance Commission has received information indicating that you may have violated certain provisions of the Oklahoma Insurance Code. Proof of the allegations arising from that information, if established at a formal hearing, could result in censure, suspension or revocation of your insurance agent license and/or a fine of up to ... $1,000.00 ... for each occurrence. This is to advise you of the allegations, and to offer you an opportunity to show that you are in compliance with state law.

The allegations giving rise to this letter are as follows:

1. That you are a licensed resident insurance agent in the State of Oklahoma holding license number 198240.

2. That on or about the 10th day of May, 1990, you were indebted to Quaker ... for ... $26,000.00 ... for advance commissions.

3. That on the 16th day of July, 1990, a Default Judgment was obtained against you by Quaker ... in the amount of ... $26,000.00 ... in principal, ... $2,600.00 ... in attorney's fees, ... $73.00 ... in costs, ... $1,639.30 ... in interest for the year 1990, ... $2,410.40 ... in interest from January 1, 1991, and ... $9.20 ... in interest from September 20, 1991, for each day that the judgment remains unpaid.

4. That no payments on your indebtedness have been made.

5. That such conduct by you as alleged hereinabove is in violation of 36 O.S. § 1428(A)(1)(e) and (i) (1990) in that you have improperly withheld monies belonging to an insurer which were received in the course of your insurance business and in that you have, in the conduct of your affairs, used dishonest practices and have shown yourself to be untrustworthy.

Please review this letter and respond *in writing* to these allegations within ten (10) days of receipt of this letter. Should you fail to respond, further action as appropriate will be taken to determine your fitness to hold an insurance agent license in the State of Oklahoma,

ex. J. Whether Jacobs responded or not does not appear.

"[T]hereafter Dangerfield, in October and November of 1991 paid as a settlement amount on the judgment approximately ... $6,000.00 in addition to the garnished

amount," stips. ¶ 13. It appears that, pursuant to said settlement, Quaker relinquished further action against Dangerfield.

"[N]o reduction in the amount owed has ever been reflected in collection efforts against [Jacobs]," stips. ¶ 13.

The parties stipulate that Quaker notified the Commissioner only of Jacobs and not of Dangerfield "because Dangerfield had entered into a settlement agreement with Quaker," stips. ¶ 13. This stipulation is difficult to reconcile with other stipulated facts, which indicate that Quaker notified the Commissioner of Jacobs but not of Dangerfield months before Quaker garnished Dangerfield and then settled with him.

On December 26, 1991, Jacobs declared bankruptcy a second time, by filing his voluntary petition for relief under 11 U.S.C. Chapter 7 in this Court. In his statement of affairs and schedules filed with his petition, Jacobs reported owning no real property, and personal property worth only $210; receiving gross income of $190 per month and take-home income of $110.90 per month; incurring expenses of $1,063 per month; having received total income in 1991 of $2,099.90, in 1990 of $5,195.13, and in 1989 of $256.25; and owing debts, all unsecured, of $68,793.18. Of these debts, one for $14,000 was incurred in 1982–83 for income taxes, interest and penalties; others totalling $14,693.18 were incurred in 1988 for "Credit card purchases;" one for $8,000 was incurred in 1988 on a "judgment;" one for $32,000 was listed as incurred in 1990 and owing to "State of Oklahoma c/o Miles L. Mitzner" for "judgment/agent debit balance;" and one for $100 was incurred in 1991 for "Credit card purchases." No assets were distributed to creditors. On April 29, 1992, Jacobs received his discharge in bankruptcy. The parties stipulate that Jacobs' debt to Quaker of some $32,000 was thereby discharged, stips. ¶ 12. Two months later, Jacobs' bankruptcy case was closed.

But at approximately the same time, an administrative proceeding against Jacobs was opened before the Commissioner. On May 20, 1992, in Case No. 91–517–04, the Commissioner by Lisa G. Bays, Assistant General Counsel, issued a "Notice of Hearing and Order to Show Cause" to Jacobs. This document stated in pertinent part as follows:

## ALLEGATIONS OF FACT

1. That [Jacobs] is a licensed insurance agent in the State of Oklahoma holding license number 198240.

2. That on or about May 10, 1990, [Jacobs] was indebted to Quaker ... for ... $26,000.00 ... for advance commissions.

3. That on July 16, 1990, a Default Judgment was obtained against [Jacobs] by Quaker ... in Case No. CJ–90–4664 in the Oklahoma County District Court in the amount of ... $26,000.00 ... in principal, ... $2,600.00 ... in attorney's fees, ... $73.00 ... in costs, plus interest at the statutory rate ...

4. That [Jacobs] made no payments on the indebtedness, and the indebtedness has been discharged in the United States Bankruptcy Court for the Northern District of Oklahoma in Case No. 91–4637–W.

## ALLEGED VIOLATIONS OF LAW

1. That such conduct by [Jacobs] as alleged above is in violation of 36 O.S. § 1428(A)(1)(e)(1990), in that [Jacobs] improperly withheld monies belonging to an insurer which were received in the course of [Jacobs'] insurance business.

2. That such conduct by [Jacobs] as alleged above is in violation of 36 O.S. § 1428(A)(1)(i)(1990), in that [Jacobs] in the conduct of his affairs showed himself to be financially irresponsible.

## ORDER

WHEREFORE, [Jacobs] is hereby given notice of a hearing to be held at 1:00 o'clock p.m. on the 2nd day of July, 1992, at the Office of the Insurance Commissioner ... to determine if there are any reasons why [Jacobs'] license in the State of Oklahoma should not be suspended or

revoked and/or why a fine should not be imposed ...,

ex. K. This notice was received by Jacobs' attorney on or about May 22, 1992, stips. ¶ 14. It appears that the hearing on July 2, 1992 was continued to July 30, 1992, see motion to reopen p. 2 ¶ 2.

On July 23, 1992, Jacobs moved this Court to reopen his closed bankruptcy case "for the purpose of filing an adversary proceeding wherein [Jacobs] will request this Court to stay the Commission proceeding ... and to enjoin the State of Oklahoma ...," motion to reopen p. 2 ¶ 5. On July 27, 1992, this Court granted said motion. Thereafter, the Commissioner "voluntarily continued the administrative hearing until this Court issues its order" deciding such adversary proceeding, stips. ¶ 14.

On August 12, 1992, Jacobs filed his complaint commencing this adversary proceeding, seeking relief under 11 U.S.C. §§ 524, 525. The Commissioner answered. At a scheduling conference, the parties agreed to submit the matter for decision on stipulations and briefs. The parties filed their "Agreed Stipulations of Fact" and their respective trial briefs. Neither party filed a response brief, and the time for filing such response briefs expired. Thereafter, the Court took the matter under advisement.

## CONCLUSIONS OF LAW

■ In her answer, the Commissioner asserts that this adversary proceeding under 11 U.S.C. §§ 105, 524, 525 "is a related proceeding, not a core proceeding," answer p. 1 ¶ 1. This Court disagrees. An action before the Court which issued a discharge, for the purpose of determining the scope of said discharge under 11 U.S.C. § 524 and enforcing said discharge pursuant to 11 U.S.C. §§ 105, 525, is not merely related to the bankruptcy, but arises under Title 11 and arises in a case under Title 11, is a "proceeding ... affecting ... the adjustment of the debtor-creditor relationship," and is therefore a core proceeding under 28 U.S.C. § 157(b)(2)(0), *In re Will Rogers Jockey & Polo Club, Inc.*, 111 B.R. 948, 952 (B.C., N.D.Okl.1990). In any event, the Commissioner "consents to entry of final orders or judgment by the bankruptcy judge," answer p. 1 ¶ 1.

■ The Commissioner does not mention the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–1015, and in particular § 1012(b) thereof, which provides that "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ..." The Court therefore need not address this matter at all. Yet the Court is reluctant to ignore a statute, and accordingly has inquired into the scope and meaning of this Act. The McCarran–Ferguson Act was enacted in response to *United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). Its purpose is declared in 15 U.S.C. § 1011 and has been stated in many cases, e.g. *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 217–218, 99 S.Ct. 1067, 1076, 59 L.Ed.2d 261, 272 (1979), *F.T.C. v. Travelers Health Ass'n*, 362 U.S. 293, 299–301, 80 S.Ct. 717, 4 L.Ed.2d 724, 728–729 (1960), *First Nat'l Bank of Eastern Arkansas v. Taylor*, 907 F.2d 775 (8th Cir.1990), cert. den. 498 U.S. 972, 111 S.Ct. 442, 112 L.Ed.2d 425, *Hahn v. Oregon Physicians Service*, 689 F.2d 840 (9th Cir.1982, reh. den. 1983), cert. den. 462 U.S. 1133, 103 S.Ct. 3115, 77 L.Ed.2d 1369. It is intended specifically to provide State insurance regulatory schemes with a partial exemption from Federal antitrust laws, and generally to protect State insurance taxing and regulatory systems from being disrupted by implied pre-emption. It should be narrowly construed, *Cochran v. Paco, Inc.*, 606 F.2d 460 (5th Cir.1979), *Securities & Exch. Commission v. Republic Nat'l Life Ins. Co.*, 378 F.Supp. 430 (S.D.N.Y.1974). This is a specific application of the general principle that, where the reason for a rule ceases, the rule ceases also, *Bruning v. U.S.*, 376 U.S. 358, 363, 84 S.Ct. 906, 909, 11 L.Ed.2d 772, 776 (1964). The expressed policy of and reasons for the McCarran–Ferguson Act have nothing to do with a Bankruptcy Court's attempt to enforce its discharge against a particular alleged epi-

sode of debt-collection activity under color of State insurance law. This Court does not attempt to displace, pre-empt or take over Oklahoma's taxation and regulation of the insurance business. Hence this action under 11 U.S.C. §§ 524, 525 does not offend the McCarran–Ferguson Act. This Court may reconsider the matter if it is properly raised and argued by the Commissioner in another case. But for present purposes, the Court is satisfied that this action may proceed notwithstanding 15 U.S.C. § 1012(b). Compare *In re Massenzio,* 121 B.R. 688, 691–692 (B.C., N.D.N.Y. 1990).

■ Nor does the State of Oklahoma's sovereign immunity protect the Commissioner from an action for injunctive relief, 11 U.S.C. § 106(c), *In re Crook,* 966 F.2d 539, 541–543 (10th Circ.1992), *In re Massenzio,* 121 B.R. p. 693.

■ In a suit for injunctive relief, the plaintiff, here Jacobs, must prove his entitlement to relief by a preponderance of the evidence, 42 AM.JUR.2D (1969) "Injunctions" § 287 p. 1038.

Jacobs sues the Commissioner under 11 U.S.C. §§ 524 and 525. 11 U.S.C. § 524(a)(2) provides that

A discharge in a case under this title ... operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any [discharged] debt as a personal liability of the debtor ...

11 U.S.C. § 525(a) provides in pertinent part that

... a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to ... or discriminate with respect to employment against, a person that is or has been a debtor under this title ... solely because such ... debtor is or has been a debtor under this title ..., has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title ...

Jacobs charges that the Commissioner's order to show cause why Jacob's insurance agent license should not be revoked is an attempt to collect a discharged debt *in personam,* which violates the discharge under § 524(a)(2); or is punitive action based solely on nonpayment of a discharged debt, which violates the prohibition of discriminatory treatment under § 525(a); or both. The Commissioner argues that she does not try to collect Quaker's debt, but only to discipline Jacobs and protect the public against an irresponsible and unscrupulous insurance agent who happens to have gone bankrupt, hence she does not violate either §§ 524(a)(2), 525(a).

■ The Commissioner's administrative action purports to proceed under 36 O.S. § 1428, which provides in pertinent part as follows:

A. 1. The Commissioner ... shall censure, suspend, or revoke, or refuse to issue, continue, or renew, any license issued or applied for pursuant to the provisions of the Insurance Agents Licensing Act if ... the Commissioner ... finds as to the licensee any one or more of the following conditions:

.    .    .    .    .

e. Improperly withholding, misappropriating, or converting to his own use any monies belonging to policyholders, insurers, beneficiaries, or others received in the course of his insurance business, or

.    .    .    .    .

i. In the conduct of his affairs, the licensee has used fraudulent, coercive, or dishonest practices, or has shown himself to be incompetent, untrustworthy, or financially irresponsible ...

A proceeding under these statutes would not purport to collect any debt, or to impose fine or revocation of license merely because a debt had not been paid or a licensee had been insolvent or had gone bankrupt. On the face of things, therefore, the Commissioner's proceeding appears to be proper, and violates neither the

discharge under § 524 nor the prohibition against discrimination under § 525.

But this Court does not rest with a glance at "the face of things." As a general rule, a court of equity looks through form to substance, 27 AM.JUR.2D (1966) "Equity" § 127. Equity jurisdiction involves the right and the duty to penetrate all masks and covers and see through to the real substance, *Loomis v. Callahan,* 196 Wis. 518, 220 N.W. 816, 821 (1928), dissenting opinion—majority opinion overruled by *State of Wisconsin ex rel. Thomson v. Giessel,* 267 Wis. 331, 65 N.W.2d 529, 540 (1954). The same rule applies in bankruptcy. Actions which, regardless of their superficial rationalization, are intended and actually work to extort payment of a discharged debt, violate the discharge under § 524, e.g. *In re Lanford,* 10 B.R. 132 (B.C., D.Minn.1981), withholding college transcript; *In re Goodman,* 34 B.R. 23 (B.C., D.Ore.1983), criminal prosecution; *In re Olson,* 38 B.R. 515 (B.C., N.D.Iowa 1984), refusing medical services; *In re Guinn,* 102 B.R. 838 (B.C., N.D.Ala.1989), refusal to deal and termination of credit union membership. As for § 525,

There are sometimes difficult problems of proof with respect to whether a particular course of conduct is discriminatory. As in cases of racial discrimination, the court must look at the practical effects of the conduct. The court must determine whether the asserted reason for the acts the debtor complains of is in fact the actual reason or only a pretext for prohibited discrimination. If a test or requirement has the effect of excluding a bankruptcy debtor solely because of past insolvency or solely because of past nonpayment of dischargeable debts, it discriminates in a manner prohibited by section 525,

3 *Collier on Bankruptcy* (15th ed. 1992) ¶ 525.05 p. 525–18. This Court proceeds to consider the circumstances herein, to determine whether the Commissioner's ostensible reasons for her actions are genuine or are merely a pretext.

The Commissioner declares that "administrative action would have been pursued against [Jacobs] even if [he] had paid the debt, if it had been paid in an untimely manner," answer p. 3 ¶ 10. Jacobs responds that, if this were true, similar action would have been commenced against Dangerfield. The Commissioner replies that she "did not initiate action against ... Dangerfield, because [she] did not receive any notice [from Quaker] regarding Dangerfield ...," def.'s brief p. 2. The Commissioner notes that, having learned of Dangerfield in the course of her action against Jacobs, she "has jurisdiction to initiate action against him as well," *id.* This Court observes that "having jurisdiction" to proceed against Dangerfield, and actually proceeding against him, are two different things; and the Commissioner does not say she is in fact initiating proceedings against Dangerfield. Nevertheless, the Court concludes that, given the Commissioner's representations in the record, the bare fact that she has not yet proceeded against Dangerfield is inconclusive.

It is obvious from the record herein that Quaker and its receiver were interested solely in collecting a debt. Neither the default judgment nor Quaker's letters to Jacobs make any suggestion of impropriety, misappropriation, conversion, fraud, coercion, dishonesty, incompetence, breach of trust, financial irresponsibility, or misconduct of any nature by Jacobs as an agent. Quaker simply demands payment of its debt. Quaker's motive need not be shared by the Commissioner. But the Commissioner's own notice to show cause to Jacobs also contains no allegation of any fact save bare nonpayment of a debt.

36 O.S. § 1428(A)(1)(e) by its terms seems intended to address situations such as theft of cash from an insurer's coffers, or conversion of an insurer's payment of benefits or an insured's premiums, by an agent. Jacobs is not alleged to have done any such things. Jacobs merely drew his salary, which took the form of "advances on commissions," and then failed to sell enough insurance to make the salary worth Quaker's while. He was legally obliged to repay Quaker for its unremunerative in-

vestment in him. But he is no longer so obliged, because he has been discharged in bankruptcy. For this alone, the Commissioner proposes to punish him.

36 O.S. § 1428(A)(1)(i) by its terms seems intended to address situations such as sale of policies by fraud, coercion, or other "dishonesty," or such gross mismanagement of one's insurance business and other affairs as would amount to incompetence or irresponsibility. Jacobs is not alleged to have lied to anyone, coerced anyone, or concealed or misrepresented anything. Jacobs' financial history has been unhappy; but the Commissioner's notice and order does not allege that Jacobs threw his money away, or failed to tend to business. Jacobs has gone broke twice in twenty years; but there is nothing in this record to show how and why it happened. The Commissioner does not even allege that Jacobs' bankruptcies evidence "financial irresponsibility." The Commissioner alleges only that Jacobs has not paid a debt. For this alone, the Commissioner proposes to punish him.

It is against this background that the different treatment of Dangerfield should be viewed. Of the total of $26,000, more than half was paid to Dangerfield; less than half was actually paid to Jacobs himself. Yet Jacobs himself was charged, first by Quaker and then by the Commissioner, with repayment of all of it. It can hardly be said that Jacobs improperly withheld, misappropriated, converted, lost or wasted money which was paid to someone else and which Jacobs never received at all. Even if Dangerfield had stolen it, this would not make Jacobs a thief.

There is no connection between the Commissioner's purported legal authority, 36 O.S. § 1428(A)(1)(e) and (i), and the Commissioner's factual allegations. The proceeding to revoke Jacobs' license appears insupportable even under Oklahoma law. Compare *Russell v. State ex rel. Grimes,* 672 P.2d 323, 325 (Okl.App.1983), license revoked where evidence "clearly demonstrates a course of conduct ... over an extended period of time that was incompatible with ... good faith and fair dealing ..."; *Fisher v. State Ins. Board,* 139 Okl. 92, 93, 281 P. 300 (1929), "acts ... that would justify revocation must be stated and charged with reasonable certainty," should not be left "to the discretion of boards as to where a prohibited line of conduct may be established," and should not depend on personal prejudice under color of vague statutory rubrics like "'bad practices'".

This Court's business is not to enforce Oklahoma insurance laws; but it is to enforce Federal bankruptcy laws. The proceeding to revoke Jacobs' license is an attempt to use color of State law to extort payment, or to punish nonpayment, of a debt which Federal bankruptcy law says need not be repaid. As such, the Commissioner's action violates the bankruptcy discharge under 11 U.S.C. § 524(a)(2), the nondiscrimination provisions of 11 U.S.C. § 525(a), and the Supremacy Clause of the U.S. Constitution, *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971).

■ Federalism generates friction. There are "more than 100 judicial decisions citing § 525," Douglass G. Boshkoff, *Bankruptcy–Based Discrimination,* 66 AM.BANKR.L.J. 387, 389 (1992). This Court hopes to minimize conflict between the Federal bankruptcy discharge and the legitimate requirements of Oklahoma law and regulatory activity. Debtor relief should not be an imposition on the public, *Securities & Exch. Commission v. United States Realty & Improv. Co.,* 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293, 1303 (1940). The discharge is meant to provide a fresh start to honest but unfortunate debtors, *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). As this Court has often held, the discharge is not meant to provide a haven for dishonest and irresponsible debtors, *In re Szafranski,* 147 B.R. 976, 980–81, 987–89 (B.C., N.D.Okl.1992); *In re Culp,* 140 B.R. 1005, 1010–1014 (B.C., N.D.Okl.1992); *In re Manley,* 135 B.R. 137, 147 (B.C., N.D.Okl. 1992); *In re Henricksen,* 131 B.R. 467, 471–473 (B.C., N.D.Okl.1991); *In re Goodson,* 130 B.R. 897, 903 (B.C., N.D.Okl.1991);

*In re Jernigan,* 130 B.R. 879, 893–894 (B.C., N.D.Okl.1991); *In re Higginbotham,* 111 B.R. 955, 961–964 (B.C., N.D.Okl.1990). The present problem should be approached in the same manner. The Court notes that some evidence appears which might tend to show that Jacobs is irresponsible or even dishonest (e.g. repeated bankruptcies, wide fluctuations in income, use of credit cards, failure to earn *any* commissions whatever during 10 months on Quaker's payroll, a disparity between current income and current expenses which is *prima facie* implausible). But the Commissioner does not allege these things, or purport to rely on any of them as cause for disciplining Jacobs. The Commissioner purports to consider nonpayment of a discharged debt, in and of itself, as sufficient cause to punish Jacobs. This may be improper under Oklahoma insurance law; but it is certainly improper under Federal bankruptcy law. This Court is compelled to intervene.

 Although the Commissioner's issuance of a notice to show cause is not final, the matter is nevertheless ripe for this Court's intervention. The discharge should protect debtors not only against improper rulings, but against improper proceedings *ab initio.* Here, the entire proceeding is demonstrably improper; for it begins with a notice and order to show cause whose only basis is mere nonpayment of a discharged debt.

Accordingly, Jacobs' request for injunctive relief under 11 U.S.C. §§ 524(a)(2), 525(a) is granted. The Commissioner is enjoined from initiating or pursuing any further collection efforts on behalf of Quaker; from pursuing any further proceedings against Jacobs on account of nonpayment of Quaker's debt in her Case No. 91–517–04; and from initiating or pursuing any other such cases against Jacobs—provided, however, that nothing herein shall prevent the Commissioner from initiating an action against Jacobs which actually serves the legitimate purposes of 36 O.S. § 1428(A)(1)(e) and (i), and which is brought in good faith for the protection of the public, on reasonable grounds other than the bare nonpayment

of a discharged debt—but provided, further, that any subsequent action by the Commissioner which proves to be improper may constitute a violation of this injunction and a contempt of this Court, for which the Commissioner or her officers may be individually liable, *In re Graham,* 981 F.2d 1135 (10th Circ.1992). Judgment shall issue in conformity herewith.

AND IT IS SO ORDERED.